[No. A134137. First Dist., Div. Three. Aug. 20, 2012.]

In re H.R., a Person Coming Under the Juvenile Court Law.
DEL NORTE COUNTY DEPARTMENT OF HEALTH AND HUMAN
SERVICES, Plaintiff and Respondent, v.
DYLAN N. et al., Defendants and Respondents;
YUROK TRIBE, Intervener and Appellant.

**Counsel**

Charles N. Henry for Intervener and Appellant.

Gretchen Stuhr for Plaintiff and Respondent.

No appearance for Defendants and Respondents.

**Opinion**

**POLLAK, J.**—In 2010, legislation was enacted establishing "tribal customary adoption" as an alternative permanent plan for a dependent Indian child who cannot be reunited with his or her parents. Tribal customary adoption is intended to provide an Indian child with the same stability and permanency as traditional adoption under state law without the termination of parental rights, which is contrary to the cultural beliefs of many Native American tribes. In this case, the Yurok Tribe (the tribe) intervened in the dependency proceedings prior to the jurisdictional hearing and recommended tribal customary adoption as the permanent plan for the minor. The tribe now contends the juvenile court erred in terminating parental rights and selecting traditional adoption as the permanent plan. We disagree with the tribe's contention that the court was required to select tribal customary adoption as the child's permanent plan simply because the tribe elected such a plan but conclude that, in the absence of a finding that tribal customary adoption would be detrimental to the minor, the court erred in failing to select such a permanent plan in this case.

## Factual and Procedural Background

On June 17, 2010, the Del Norte County Department of Health and Human Services (the department) filed a petition alleging that the minor came within the jurisdiction of the juvenile court under Welfare and Institutions Code section 300[1] based on his parents' history of chronic substance abuse. On June 25, 2010, the tribe determined that the minor was eligible for enrollment in the tribe because his father is an enrolled tribe member and moved to intervene in the proceedings under the Indian Child Welfare Act of 1978 (ICWA; 25 U.S.C. § 1901 et seq.). The tribe was granted intervener status the same day. In July 2010 the court sustained the allegations in the petition. At the disposition hearing, the minor was declared a dependent of the court and by December 2010 he was placed with his paternal grandmother.

Following an unsuccessful attempt at family reunification, a permanency planning hearing was scheduled for October 2011. In advance of the hearing, the department filed a report recommending termination of parental rights and the selection of adoption as the minor's permanent plan. The report explained that the tribe "has traditionally been opposed to adoption, for the reason that it terminates parental rights and could potentially disconnect a Native child from their culture. In order to reach a compromise, the tribe [proposed] the implementation of a new permanent option for [the minor]: tribal customary adoption." Although the grandmother was initially willing to consider a tribal customary adoption, "ultimately she decided that it would not be in the best interest of her grandson to be adopted through [tribal customary adoption], and she would not be willing to go through with the process. [She] has stated that she does not feel the tribe has enough experience with this option and she does not want to commit herself to the tribe's fluctuating expectations."

Attached to the report, as required by section 366.22, subdivision (c)(1), was an assessment from the State Department of Social Services (CDSS) recommending tribal customary adoption as the child's permanent plan. The assessment explains, the minor "is currently placed with his paternal grandmother who has expressed a desire to adopt him. The tribe has expressed a willingness to support a tribal customary adoption . . . and the undersigned had been working with the tribe and the family to that end. . . . The grandmother . . . recently indicated she is no longer willing to consider a tribal customary adoption. [CDSS] believes a tribal customary adoption is in [the minor's] best interest because it would allow him the permanency and stability that adoption would afford him while also honoring the cultural values of his tribe." The tribe submitted a recommendation for legal guardianship with the grandmother. The tribe explained that it was recommending guardianship rather than tribal customary adoption "due to the foster parents'

---

[1] All statutory references are to the Welfare and Institutions Code unless otherwise noted.

display of a lack of trust and commitment during the process to develop and follow a [tribal customary adoption] agreement . . . . In the future, the . . . Tribe is willing to reconsider a [tribal customary adoption] when the foster parent is willing to agree to the [tribal customary adoption] cultural agreement." Based on these submissions, a contested hearing was requested and scheduled for November 2011.

On November 17, 2011, the tribe withdrew its recommendation for guardianship and the parties appeared before the court with a tentative agreement for a tribal customary adoption. The hearing was continued until December 12, 2011, for "a continued 366.26 or receipt of an approved tribal customary adoption order" (the order). On December 9, the tribe filed the order, which approved an attached tribal customary adoption agreement (the agreement) signed by the tribe, the grandparents and their attorneys.

Under the agreement, the grandparents and the tribe agreed as follows: "1. The birth parents' parental rights shall not be terminated. All rights and responsibilities for the minor child rest with the adoptive parents, the child's birth parents do not retain any rights or responsibilities, or have any obligations toward the child. [¶] 2. Contact between the birth parents and the child, and the child's extended family members and the child, shall be at the sole discretion of the adoptive parents. [¶] 3. The child is an enrolled member of the . . . Tribe, and retains all rights as a Yurok tribal member. [¶] 4. The child retains all inheritance rights as an enrolled member of the . . . tribe. [¶] 5. By signing this agreement, all parties agree that the tribal customary adoption is a permanent adoptive placement for the child. All parties waive their right to request modification of the permanent adoptive placement of the child with the adoptive parents. [¶] 6. All rights not specified herein shall remain with the adoptive parents. [¶] 7. The adoptive parents agree to give [the minor] the opportunities available to him to enrich [him] in the Native American culture. [The minor] will be provided the opportunity to visit the Yurok ancestral territory and Yurok community, as long as the adoptive parents see it as an appropriate and healthy environment for [the minor] to develop his identity as a Yurok person."

The order entered by the tribe finds, among other things, that children "deserve to have knowledge about their unique cultural heritage including their tribal customs, history, language, religion, values and political systems" and orders that "all parties make a good faith effort to continually foster and increase the minor's knowledge of and participation in the unique Yurok cultural heritage." The order finds further that "the minor will benefit from a relationship with his biological parents and extended family and . . . that a good faith effort toward contact and visitation with the minor's entire extended family is in the minor's best interests and orders that all parties continually make such good faith efforts to foster visitation."

At the December 12 hearing, the grandparents withdrew their consent to the agreement. They complained the order entered by the tribe went beyond the scope of the agreement they signed and that they believed that it gave the tribe too much control over the child's life. The grandfather explained, "My concern is that . . . his birth parents . . . have both been in custody due to . . . drug violations and [their] extended family has as well. I don't think we should be compelled to take [the minor] to visit with these people." He was also concerned that because tribal customary adoption is a new form of adoption, in the future "there's a possibility that the tribe may lend itself in a more direct manner into our relationship with [the minor]." Finally, he testified that he and the grandmother respected the minor's tribal heritage and would encourage him to spend time with his extended family and support him should he choose to participate in tribal activities, but that they "just want him to grow up in a normal, ordinary . . . family without having this order hanging over [their] heads." The grandmother also expressed concerns about how potential disputes between the grandparents and the tribe would be resolved should the tribe come to believe that they were not making good faith efforts as required by the order. Both grandparents testified that while they would prefer an adoption under state law with termination of parental rights, they would proceed with the adoption nonetheless should the court select tribal customary adoption as the child's permanent plan.

After hearing testimony from numerous witnesses, including the social worker and an expert on the tribe, the court selected traditional state law adoption as the permanent plan and terminated parental rights. The court opined that there would be no meaningful difference for the minor under either form of adoption and concluded that under these circumstances the statute compelled the court to order traditional adoption and terminate parental rights. The court observed that "If I choose regular California state law adoption or tribal customary adoption, my guess is that going forward in [the minor's] life and the way he lives his life, it's not going to make one speck of difference." The court added, "[W]hat we really have here is an unsettled area of law because the amendments in the statute are so new. And we don't know exactly what the . . . final rules of procedure are going to be going forward. . . . [¶] . . . [¶] So the question really comes down then to . . . whether the order of the tribal council means . . . that a termination of parental rights is therefore detrimental; in other words, that is a compelling reason to believe that termination of parental rights would be detrimental to this child." The court recognized that "it may well be detrimental to the tribe to not have control over the decisions of this kind that are made about tribal members who are children," but found that termination would not be detrimental to the minor. The court explained that "the way the statute is set up in effect, . . . the default condition is to terminate parental rights. There's a presumption really that's established, they don't use the word presumption,

but from what's said here, it's pretty clear that there's a presumption that you terminate parental rights unless you can show a compelling reason to believe there's detriment."

The tribe filed a timely notice of appeal.

## Discussion

### I. *Tribal customary adoption of an Indian child is a new alternative to adoption with termination of parental rights*

"California has a comprehensive statutory scheme establishing procedures for the juvenile court to follow when and after a child is removed from the home for the child's welfare. [Citations.] 'The objective of the dependency scheme is to protect abused or neglected children and those at substantial risk thereof and to provide permanent, stable homes if those children cannot be returned home within a prescribed period of time.' [Citation.] When the child is removed from the home, the court first attempts, for a specified period of time, to reunify the family." (*In re Celine R.* (2003) 31 Cal.4th 45, 52 [1 Cal.Rptr.3d 432, 71 P.3d 787].) When those efforts fail, " 'the court must terminate reunification efforts and set the matter for a hearing pursuant to section 366.26 for the selection and implementation of a permanent plan.' " (*Ibid.*) " 'Once reunification services are ordered terminated, the focus shifts to the needs of the child for permanency and stability.' [Citation.] 'A section 366.26 hearing . . . is a hearing specifically designed to select and implement a permanent plan for the child.' [Citation.] It is designed to protect children's 'compelling rights . . . to have a placement that is stable, permanent, and that allows the caretaker to make a full emotional commitment to the child.' " (*Id.* at pp. 52–53.) "The Legislature has thus determined that, where possible, adoption is the first choice. 'Adoption is the Legislature's first choice because it gives the child the best chance at [a full] emotional commitment from a responsible caretaker.' " (*Id.* at p. 53.)

Effective July 2010, the Legislature enacted Assembly Bill No. 1325 (2009–2010 Reg. Sess.) (Assembly Bill 1325), codifying tribal customary adoption as an alternative permanent plan for an Indian child. (Stats. 2009, ch. 287, § 12.) As expressed in "All County Letter No. 10-47" issued by CDSS on October 27, 2010 (All County Letter),[2] "Tribal customary adoption is considered an agency adoption. However, [a tribal customary adoption] is an adoption which may occur for an Indian child who is a dependent of the

---

[2] Assembly Bill 1325 provides that "the Department of Social Services may implement and administer the applicable provisions of this act through all-county letters or similar instruction from the director until such time as the regulations are adopted." (Stats. 2009, ch. 287, § 26.) No such regulations have yet been adopted.

California court, under the customs, laws or traditions of an Indian child's tribe, but where termination of parental rights . . . is not required. While tribal customary adoption is unique, it is intended to be a seamless integration into the current process of conventional adoption." (CDSS, All County Letter, § 1.1 <www.cdss.ca.gov/lettersnotices/entres/getinfo/acl/2010/10-47.pdf> [as of Aug. 20, 2012].)

Among other amendments to the applicable provisions in the Welfare and Institutions Code, Assembly Bill 1325 added section 366.24.[3] This provision defines tribal customary adoption as "adoption by and through the tribal custom, traditions, or law of an Indian child's tribe" and specifies that "[t]ermination of parental rights is not required to effect the tribal customary adoption." (§ 366.24, subd. (a).) The juvenile court "may continue" a hearing under section 366.26 to provide a tribe recommending tribal customary adoption sufficient time to conduct the required home study and produce a tribal customary adoption order.[4] (§ 366.24, subd. (c)(6).) "Upon the court affording full faith and credit to the tribal customary adoption order and the tribe's approval of the home study, the child shall be eligible for tribal customary adoptive placement." (Id., subd. (c)(8).) Once the tribal customary adoption process is complete, "the tribal customary adoptive parents shall have all of the rights and privileges afforded to, and are subject to all the duties of, any other adoptive parent or parents pursuant to the laws of this state." (Id., subd. (c)(13).)

According to legislative analysis in the Assembly, the procedures enacted under Assembly Bill 1325 "allow Indian children in the child welfare system to be provided with the permanence offered by adoption without first terminating the birth parents' rights through the use of tribal customary

---

[3] The section is to remain in effect only until January 1, 2014, unless extended by subsequent legislation. (Stats. 2009, ch. 287, § 1.) The Legislature has directed the Judicial Council to "study California's tribal customary adoption provisions and their effects on children, birth parents, adoptive parents, Indian custodians, tribes, and the court, and . . . report all of its findings to the Legislature on or before January 1, 2013." (§ 366.24, subd. (f).)

[4] Section 366.24, subdivision (c)(6) reads: "If the tribe identifies tribal customary adoption as the permanent placement plan for the Indian child, the court may continue the selection and implementation hearing governed by Section 366.26 for a period not to exceed 120 days to permit the tribe to complete the process for tribal customary adoption and file with the court a tribal customary adoption order evidencing that a tribal customary adoption has been completed. The tribe shall file with the court the tribal customary adoption order no less than 20 days prior to the date set by the court for the continued selection and implementation hearing. The department shall file with the court the addendum selection and implementation hearing court report no less than seven days prior to the date set by the court for the continued selection and implementation hearing. The court shall have discretion to grant an additional continuance to the tribe for filing a tribal customary adoption order up to, but not exceeding, 60 days. If the child's tribe does not file the tribal customary adoption order within the designated time period, the court shall make new findings and orders pursuant to subdivision (b) of Section 366.26 and this subdivision to determine the best permanent plan for the child."

adoption." (Assem. Conc. Sen. Amends. to Assem. Bill 1325 (2009–2010 Reg. Sess.) as amended Sept. 2, 2009, p. 1.) This analysis explains, "According to the author [of Assembly Bill 1325], the termination of parental rights which is currently a prerequisite to adoption of a child is 'totally contrary to many tribes' cultural beliefs and it is, in fact, associated with some of the most oppressive policies historically used against tribes and Indian people . . . [.]' By contrast, historically and traditionally, most tribes have practiced adoption by custom and ceremony. In addition, the termination of parental rights can disrupt the child's ability to be a full member of the tribe or participate fully in tribal life. The author states that the use of guardianship as a means of avoiding these complications is not a sufficient solution because it does not offer the same permanency as adoption and does not allow guardians to receive adoption assistance benefits." (*Id.* at p. 4.)

*In re A.A.* (2008) 167 Cal.App.4th 1292 [84 Cal.Rptr.3d 841], illustrates the problem the Legislature sought to address with the recognition of tribal customary adoption. In that case, the tribe identified guardianship as the appropriate permanent plan in part because the termination of parental rights was contrary to the tribe's customs. (*Id.* at p. 1323.) On appeal, the court affirmed the termination of parental rights and selection of adoption as a permanent plan, noting that "although guardianship may have served the Tribe's interests, the court, in assessing the children's best interests, was not compelled to agree with the Tribe." (*Id.* at p. 1325.) The court explained, ". . . Indian children or not, the children had a fundamental interest in stability and permanency. [Citation.] Adoption gives a child the best chance at a full emotional commitment from a responsible caretaker. [Citation.] Guardianship, while a more stable placement than foster care, is not irrevocable and falls short of the secure and permanent future the Legislature had in mind for a dependent child. [Citation.] . . . Under these circumstances, the court could conclude that the Tribe's identification of guardianship as a permanent plan for the children was not a compelling reason for finding that termination would be detrimental." (*Ibid.*; see *In re T.S.* (2009) 175 Cal.App.4th 1031, 1040–1041 [96 Cal.Rptr.3d 706] [juvenile court retains discretion to reject the permanent plan of guardianship identified by a child's tribe in favor of adoption].) Prior to the recognition of tribal customary adoption, there was no mechanism to provide permanency to an Indian child without terminating parental rights and severing the tribal connection.

II. *Tribal customary adoption is the preferred permanent plan for an Indian child if recommended by the child's Indian tribe*

Section 366.26, as amended to reflect the additional permanent plan option available to Indian children, provides that the court "shall make findings and orders in the following order of preference: [¶] (1) Terminate the rights of the

parent or parents and order that the child be placed for adoption and, upon the filing of a petition for adoption in the juvenile court, order that a hearing be set. . . . [¶] (2) Order, without termination of parental rights, the plan of tribal customary adoption, as described in Section 366.24, through tribal custom, traditions, or law of the Indian child's tribe, and upon the court affording the tribal customary adoption order full faith and credit at the continued selection and implementation hearing, order that a hearing be set pursuant to paragraph (2) of subdivision (e)." (§ 366.26, subd. (b), as amended by Stats. 2009, ch. 287, § 15.)

In stating the order of preference, section 366.26, subdivision (b) thus initially seems to indicate that traditional adoption including the termination of parental rights should be preferred over tribal customary adoption. However, the order of preference as between these two alternatives when the tribe has recommended tribal customary adoption is effectively reversed by qualifications that follow.

■ Section 366.26, subdivision (b) concludes, "In choosing among the above alternatives the court shall proceed pursuant to subdivision (c)." Subdivision (c)(1) provides: "If the court determines . . . by a clear and convincing standard, that it is likely the child will be adopted, the court shall terminate parental rights and order the child placed for adoption. . . . Under these circumstances, the court shall terminate parental rights unless . . . the following applies: [¶] . . . [¶] (B) The court finds a compelling reason for determining that termination would be detrimental to the child due to . . . the following circumstances: [¶] . . . [¶] (vi) The child is an Indian child and there is a compelling reason for determining that termination of parental rights would not be in the best interest of the child, including, but not limited to: [¶] (I) Termination of parental rights would substantially interfere with the child's connection to his or her tribal community or the child's tribal membership rights. [¶] (II) The child's tribe has identified guardianship, long-term foster care with a fit and willing relative, tribal customary adoption, or another planned permanent living arrangement for the child."[5] Section

---

[5] The so-called "Indian child exception" to termination of parental rights found in section 366.26, subdivision (c)(1)(B)(vi), into which tribal customary adoption was incorporated, was enacted by the Legislature in 2006. (Stats. 2006, ch. 838, § 52, p. 6598.) The Indian child exception reflects the Legislature's recognition that "although ICWA was enacted more than 25 years ago, state courts and county agencies in California continue to violate not only the spirit and intent of ICWA, but also its express provisions." (Sen. Rules Com., Off. of Sen. Floor Analyses, Unfinished Business Analysis of Sen. Bill No. 678 (2005–2006 Reg. Sess.) as amended Aug. 21, 2006, p. 11.) The 2006 legislation was a prior attempt by the Legislature to "affirm[] the state's interest in protecting Indian children and the child's interest in having tribal membership and a connection to the tribal community." (*Id.* at p. 2.)

366.26, subdivision (c)(2)(B)(iii) directs the court not to terminate parental rights in the case of an Indian child if "[t]he court has ordered tribal customary adoption pursuant to Section 366.24."

Prior to the 2010 amendments, courts acknowledged that any potential detriment to a child caused by interference with his or her tribal connection "must be considered in view of the legislative preference for adoption when reunification efforts have failed." (*In re Jasmine D.* (2000) 78 Cal.App.4th 1339, 1348 [93 Cal.Rptr.2d 644]; see *In re A.A.*, *supra*, 167 Cal.App.4th at p. 1320; *In re T.S.*, *supra*, 175 Cal.App.4th at pp. 1040–1041.) By its reliance on "tribal custom, traditions, or law of an Indian child's tribe," tribal customary adoption is designed to provide the minor with the same stability and permanence of traditional adoption without terminating parental rights. Thus, an Indian child's interest in stability and permanence no longer provides a counterbalance to the child's interest in maintaining his or her tribal connection.

■ The new statutory provisions recognize that the termination of parental rights will normally cause detriment to an Indian child by interfering with his or her tribal connections. These provisions implement the legislative finding and declaration that "[i]t is in the interest of an Indian child that the child's membership in the child's Indian tribe and connection to the tribal community be encouraged and protected, regardless of whether the child is in the physical custody of an Indian parent or Indian custodian at the commencement of a child custody proceeding, the parental rights of the child's parents have been terminated, or where the child has resided or been domiciled." (§ 224, subd. (a)(2); see 25 U.S.C. § 1902 ["it is the policy of this Nation to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families by the establishment of minimum Federal standards for the removal of Indian children from their families and the placement of such children in foster or adoptive homes which will reflect the unique values of Indian culture . . ."]; *Mississippi Choctaw Indian Band v. Holyfield* (1989) 490 U.S. 30, 32–36 [104 L.Ed.2d 29, 109 S.Ct. 1597]; *In re W. B.* (2012) 55 Cal.4th 30, 48; *In re Desiree F.* (2000) 83 Cal.App.4th 460, 469 [99 Cal.Rptr.2d 688] [ICWA "presumes it is in the best interests of the child to retain tribal ties and cultural heritage and in the interest of the tribe to preserve its future generations, a most important resource"].)

Accordingly, while the statutory construction of section 366.26 places the burden on the party opposing traditional adoption to show that this form of adoption would be detrimental to the minor (cf. *In re S.B.* (2008) 164

Cal.App.4th 289, 297 [79 Cal.Rptr.3d 449]), the interference with the minor's tribal ties that the Legislature has recognized and sought to avoid provides the prima facie showing of detriment that tips the preference in favor of tribal customary adoption. Absent some evidence of countervailing detriment to the minor that the court, in its discretion, concludes would result from this form of adoption, the default in the case of an Indian child is tribal customary adoption.

■ California Rules of Court, rule 5.725(d), which was amended effective July 1, 2010, to reflect the addition of tribal customary adoption as an alternative permanent plan, is somewhat clearer in this respect. The rule lists tribal customary adoption as the first alternative when determined by the court to be an appropriate permanent plan for an Indian child.[6]

III. *Selection of tribal customary adoption remains within the discretion of the juvenile court subject to an abuse of discretion standard*

■ Although the statute now modifies the preferred permanent plan for an Indian child, contrary to the tribe's contention, nothing in the 2010 amendments suggests that the Legislature intended to alter the long-standing rule that the selection of a permanent plan is vested in the sound discretion of the trial court. (*In re Jasmine D., supra,* 78 Cal.App.4th at p. 1351.) Whether there is a compelling reason not to terminate parental rights has been described as a "quintessentially discretionary determination." (*Ibid.*) Nothing in Section 366.24 removes that discretion.

■ Section 366.24, subdivision (c)(6) provides that "If the tribe identifies tribal customary adoption as the permanent placement plan for the Indian child, the court *may* continue the selection and implementation hearing governed by Section 366.26 for a period not to exceed 120 days to permit the

---

[6] California Rules of Court, rule 5.725(d) states: "At the [section 366.26] hearing, the court . . . must proceed as follows: [¶] (1) In the case of an Indian child, after the agency has consulted with the tribe, when the court has determined with the concurrence of the tribe that tribal customary adoption is the appropriate permanent plan for the child, order a tribal customary adoption in accordance with section 366.24; or [¶] (2) Order parental rights terminated and the child placed for adoption if the court determines, by clear and convincing evidence, that it is likely the child will be adopted, unless: [¶] . . . [¶] (C) The court finds a compelling reason to determine that termination would be detrimental to the child because of the existence of one of the following circumstances: [¶] . . . [¶] (vi) The child is an Indian child and termination of parental rights would substantially interfere with the child's connection to his or her tribal community or the child's tribal membership rights, or the child's tribe has identified guardianship, long-term foster care with a fit and willing relative, tribal customary adoption, or another planned permanent living arrangement as the appropriate permanent plan for the child."

tribe to complete the process for tribal customary adoption and file with the court a tribal customary adoption order evidencing that a tribal customary adoption has been completed." (Italics added.) The phrase, "[i]f the tribe identifies tribal customary adoption as the permanent placement plan for the Indian child," does not delegate to the tribe the authority to select the permanent plan. Rather, it recognizes that tribal customary adoption is an available option only when identified as such by the child's tribe. Similarly, section 366.26, subdivision (e)(2) provides in part, "In the case of an Indian child, if the Indian child's tribe has *elected* a permanent plan of tribal customary adoption, the court, upon receiving the tribal customary adoption order will afford the tribal customary adoption order full faith and credit to the same extent that the court would afford full faith and credit to the public acts, records, judicial proceedings, and judgments of any other entity."[7] (Italics added.) The use of "elect[]" in this subdivision likewise acknowledges only that tribal customary adoption cannot be selected without the tribe's recommendation.

The requirement that the court afford the tribal customary adoption order full faith and credit does not place a restriction on the court's discretion to select the most appropriate permanent plan. Rather, the reference to full faith and credit provides the rationale and authorization for effecting an adoption without terminating parental rights, should the court select tribal customary adoption as the permanent plan. Normally, adoption cannot be effected unless and until parental rights are terminated. (See, e.g., Cal. Rules of Court, rule 5.725(g) ["The rights of the mother, any presumed father, any alleged father, and any unknown father or fathers must be terminated in order to free the child for adoption."].) By giving full faith and credit to the tribal customary adoption order, a legal basis is created for recognizing the tribal customary adoption despite the failure to terminate parental rights.

■ As reflected throughout the statute, the reference to full faith and credit does not remove the court's authority to make the final determination of the appropriate permanent plan. Every report that the social worker is required to submit and the court required to consider before disposition must include "[f]or an Indian child, in consultation with the Indian child's tribe, whether tribal customary adoption is an appropriate permanent plan for the

---

[7] Section 366.26, subdivision (e)(2) continues: "Upon a determination that the tribal customary adoption order may be afforded full faith and credit, consistent with Section 224.5, the court shall thereafter order a hearing to finalize the adoption be set upon the filing of the adoption petition. The prospective tribal customary adoptive parents and the child who is the subject of the tribal customary adoption petition shall appear before the court for the finalization hearing. The court shall thereafter issue an order of adoption pursuant to Section 366.24."

child if reunification is unsuccessful." (§ 358.1, subd. (j).) Under section 366.24, subdivision (c)(6), after the tribe identifies tribal customary adoption as the permanent plan and the court continues the section 366.26 hearing "to permit the tribe to complete the process for tribal customary adoption and file with the court a tribal customary adoption order evidencing that a tribal customary adoption has been completed," the social services agency must file an "addendum selection and implementation hearing court report" prior to the continued hearing. As explained in the All County Letter, this report "provides the agency the opportunity to express its opinion about the prospective tribal customary adoption including providing a recommendation to the court on whether it is or is not in support of the adoption" and advises agencies to address, in addition to other things, the "[c]ontinued suitability of [tribal customary adoption] being the appropriate plan for the child." (CDSS, All County Letter, § 9.1.) This information would be unnecessary if the court did not have responsibility to determine whether the tribal customary adoption ultimately should be selected as the child's permanent plan.[8]

The frequently asked questions publication regarding tribal adoptions issued by the Judicial Council similarly explains, "Initially, it is the child's tribe who elects whether or not to pursue tribal customary adoption. An essential element of tribal customary adoption is a valid tribal customary adoption order issued by a federal recognized tribe which can be given full faith and credit by the state court. This means that tribal customary adoption is only available with the consent and participation of the child's tribe. [¶] Once the child's tribe elects tribal customary adoption as the child's preferred permanent plan, the child's permanent plan is selected at a hearing held under [section] 366.26." (Judicial Council of Cal., Tribal Customary Adoption, Frequently Asked Questions <http://www.courts.ca.gov/documents/Tribal-AdoptionFAQ.pdf> [as of Aug. 20, 2012].) According to the frequently asked questions, "There is nothing in AB 1325 that limits any party's ability to contest the selection of tribal customary adoption as a child's permanent plan in the same manner that they could contest the selection of any other permanent plan."[9] (Judicial Council of Cal., Tribal Customary Adoption, Frequently Asked Questions.)

---

[8] The All County Letter further poses the question, "How is full faith and credit used in a [tribal customary adoption]?" (boldface omitted) and explains: "At the continued [section] 366.26 hearing, the state court *may* afford full faith and credit to the tribe's [tribal customary adoption order]. This means the state court would enforce the tribe's [tribal customary adoption order] and the Indian child would be eligible for adoptive placement and ultimate finalization. This **does not** mean the state court has finalized a [tribal customary adoption] because a [tribal customary adoption] finalization hearing must still be held." (CDSS, All County Letter, § 10.2, italics added, original boldface.)

[9] One statement appearing in the California Judges Benchguide: Juvenile Dependency Selection and Implementation Hearing (CJER 2011) Indian Child, section 140.60, is potentially misleading. The benchguide correctly recognizes that under section "366.24, in consultation

In this case, the court did not order tribal customary adoption as the permanent plan prior to continuing the section 366.26 hearing. The court continued the contested hearing based on the parties' representations that an oral agreement had been reached and a continuance was required to produce the written agreement. The court's minute order recognized that if the parties were unable to complete a written agreement, the contested hearing would go forward on December 12. Although an agreement was entered and the tribal court issued a tribal customary adoption order prior to the hearing, when the prospective adoptive parents—the child's paternal grandparents—indicated reservations about proceeding with the tribal customary adoption, the juvenile court was obliged to consider their concerns. For the reasons just explained, the court was not required to give the tribal court's order full faith and credit unless and until it selected tribal customary adoption as the child's permanent plan. The tribal customary adoption order entered by the tribal court did not necessarily preclude the court from selecting a different permanent plan at the contested section 366.26 hearing after considering the relevant evidence.

IV. *The failure to select tribal customary adoption as the permanent plan in this case was an abuse of discretion*

We do not question the broad discretion of the juvenile court in selecting a child's permanent plan. (*In re Jasmine D., supra,* 78 Cal.App.4th at p. 1351.) Nonetheless, in this case we conclude that the court misunderstood the novel statutory scheme that has been adopted, at least for the moment (see fn. 3, *ante*), for an Indian child and the legislative purpose behind the recent amendments. As explained above, although section 366.26 initially reflects the Legislature's preference for traditional adoption with the termination of parental rights, Assembly Bill 1325 has modified this preference in cases involving an Indian child when the tribe elects tribal customary adoption.

Here, the court did not find that tribal customary adoption would be detrimental to the minor. The court considered that either form of adoption—i.e., traditional adoption following termination of parental rights or tribal customary adoption without terminating parental rights—was not likely "to make one speck of difference" and therefore chose traditional adoption with

---

with the child's tribe, the court may designate tribal customary adoption as the permanent plan without terminating parental rights" and explains further, "This is done through tribal customs, traditions, or law." (*Id.* at pp. 104-75 to 104-76.) However, the benchguide goes on to state: "If the tribe has chosen a permanent plan of tribal customary adoption, the court must give this tribal order full faith and credit." (*Id.* at p. 104-76) This is true only if the court selects tribal customary adoption as the permanent plan for the child. (*Ibid.*)

the termination of parental rights, incorrectly treating this alternative as the "default" selection. In so doing, the court failed to recognize the modified order of permanent plan preferences for an Indian child effected by Assembly Bill 1325 and the significance that the Legislature has attached to maintaining an Indian child's tribal connections. While the grandparents testified that they would keep the child connected to his tribal community, their promise is not enforceable and cannot be relied upon to ensure the child maintains a tribal connection. (See *In re C.B.* (2010) 190 Cal.App.4th 102, 128 [117 Cal.Rptr.3d 846] [court injects "an improper factor into the weighing process" when it relies on prospective adoptive parents' willingness to allow the children to have continued contact with mother].)

 Although the grandparents here expressed concerns about the tribe's potential interference with their right to parent should a tribal customary adoption be ordered, the court made no finding of any resulting potential detriment to the minor. The court found no reason to doubt the good faith of the tribe or the grandparents to recognize the parental rights and obligations of the adoptive parents under the tribal customary adoption order and simply acknowledged the uncertainty arising from this "unsettled area of law." The All County Letter addresses the question of "[w]hy . . . a court [would] not afford full faith and credit to the tribe's [tribal customary adoption order]?" as follows: "If an order from the Indian child's tribe (sovereign #1) violates a generally accepted public policy of California (sovereign #2), then the state court of California may not enforce the tribe's order. Other reasons may include: fraud, the entity issuing the order had no authority to do so, due process not provided or the order offends a strongly held public policy." (CDSS, All County Letter, *supra*, § 10.4, boldface omitted.) Moreover, in exercising its discretion the court undoubtedly may consider other factors, such as the potential of disrupting other beneficial ties of the minor if tribal customary adoption is selected. However, no evidence was presented suggesting any such adverse consequences to the minor that will result from the selection of this form of adoption. Therefore, in view of the legislative determination that an Indian child's best interests normally will be best served by preserving his or her tribal connections, there being no evidence to the contrary, the court abused its discretion in failing to find that the termination of parental rights would be detrimental to the minor and in failing to select tribal customary adoption as his permanent plan. (Cf. *In re C.B.*, *supra*, 190 Cal.App.4th 102 [court erred in failing to find applicability of continuing beneficial relationship of parent exception]; *In re Amber M.* (2002) 103 Cal.App.4th 681 [127 Cal.Rptr.2d 19] [same].)

## Disposition

The order terminating parental rights and selecting adoption as the permanent plan for the child is reversed and the action is remanded for further proceedings consistent with this opinion.

McGuiness, P. J., and Jenkins, J., concurred.

A petition for a rehearing was denied September 11, 2012.