Filed 6/9/15  In re Marshall W. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Shasta)

----

|  |  |
|---|---|
| In re MARSHALL W., a Person Coming Under the Juvenile Court Law. | C077708 |
| SHASTA COUNTY HEALTH AND HUMAN SERVICES AGENCY, | (Super. Ct. No. 12JVSQ2930801) |
| Plaintiff and Respondent, |  |
| v. |  |
| K. A., |  |
| Defendant and Appellant. |  |

K. A., mother of three-year-old Marshall W., appeals from an order of the Shasta County Juvenile Court denying her request to reinstate services because there was not sufficient evidence to require a hearing on the request.  Mother claims denying the request without holding a hearing was an abuse of discretion.  We affirm.

1

FACTUAL AND PROCEDURAL BACKGROUND

Marshall was born in April 2012. Medical center staff readily recognized that mother and the child's father, Alan W., were suffering from untreated mental health issues.[1] Mother appeared disinterested and would not acknowledge the baby. When prompted, she fed him only twice in a 48-hour period. Hospital staff notified the Shasta County Health and Human Services Agency (Agency).

Nineteen-year-old mother told an Agency social worker that the baby was "unexpected," that she had no idea how to care for a baby, and that she was not emotionally ready for him. Mother further advised that she had been under the care of Shasta Community Mental Health for more than a year. She said she suffered from panic and anxiety attacks and had a difficult time leaving home without the support of others.

Father told the social worker that mother had significant mood swings and would become verbally and physically abusive toward him. Father said he had to call law enforcement officers on two occasions and noted that mother would allow homeless people to enter and leave the residence without consulting him.

Father and the social worker proceeded to the family residence. A female who was unknown to father emerged from the shower. Two adults who were unknown to father were present in the house.

On May 1, 2012, a juvenile dependency petition was filed alleging that Marshall came within Welfare and Institutions Code[2] section 300, subdivision (b), in that the parents have mental health problems that interfere with their ability to provide regular and adequate care for the child. Mother indicated Indian heritage.

---

[1]     Alan W. is not a party to this appeal.

[2]     Further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

On May 1, 2012, the parents submitted the matter of detention on the social worker's report and the juvenile court ordered Marshall detained. The social worker's June 2012 report for the jurisdiction hearing indicated that Marshall had been placed in a foster home that was able to meet his needs. Mother indicated a connection to two Alaskan Indian tribes.

The social worker reported that the matter came to the Agency's attention because medical personnel were concerned that the parents were not attentive to Marshall's basic and emotional needs. Mother acknowledged that she did not know how to care for an infant. Both parents admitted to mental health issues and failure to take their prescribed psychotropic medications. Mother had declined to take the medications due to her pregnancy. The home had not been prepared for the care of an infant and there were concerns of unrelated adults living at the residence. The jurisdiction hearing was continued to allow for proper Indian Child Welfare Act (ICWA) notice.

The social worker's July 2012 report for the disposition hearing recommended that Marshall remain in foster care and that the parents receive reunification services. In June 2012, the social worker was informed that services were available through the Redding Rancheria. The social worker advised mother of the available services but she showed little interest. At that time, no Native American placement homes were available for Marshall. The Tlingit/Haida Indian Tribe of Alaska informed the Agency that Marshall would be eligible for enrollment.

The disposition report noted that the parents failed to appear at a June 2012 family team meeting and that their attendance at visitations with Marshall had been inconsistent.

In an August 2012 addendum report, the social worker noted that mother and the maternal grandfather were enrolled in the Tlingit/Haida tribe. A tribal council member indicated that the tribe hoped to build family connections between Marshall and the maternal extended family. An inter-tribal advocate was arranging for individual

parenting education for mother but she had yet to contact that resource. The parents were homeless, and visitation was inconsistent and lacking in enthusiasm.

In September 2012, the juvenile court held the contested jurisdiction and disposition hearing. The court adjudged Marshall its dependent, found that ICWA applied to the case, removed Marshall from his parents' physical custody, and ordered reunification services for both parents.

The social worker's March 2013 report for the six-month review hearing recommended that reunification services be terminated and a selection and implementation hearing be set. The report stated that mother was "unable to provide stability and safety for the child . . . . Her depression and anxiety prevent her from eating regularly, sleeping regularly and focusing on the needs of her child."

Mother was homeless. She told the social worker that she and father no longer were a couple but they were seen together in the community almost daily. Mother's parent educator noted that mother had trouble keeping her appointments and that her anxiety prevented her from participating in large group settings. Mother's family dynamics counselor reported that mother attended only one session, missed the second session, and failed to schedule any further sessions. Mother attended one session of a Native American counseling program, the Women's Talking Circle, but she made no further attempts to participate in any of the support groups.

The social worker reported that mother "has had difficulty keeping scheduled visitation" with Marshall. "Visits were put on will-call [as of August 1, 2012] and shortly thereafter reduced to one visit per week on [September 5, 2012] due to her inability to arrive at the visitation on time and her failure to notify the Family Worker and Social Worker. She would frequently arrive late, with an excuse that traffic held her up, that her bicycle broke down or the train passing made her late."

The social worker further noted that "[mother] has been offered counseling through Mental Health and Family Dynamics and has not taken advantage of those

opportunities. [Mother] continues to have anxiety to the degree that she is unable to eat, cannot sleep at night and as a result sleeps late and . . . is constantly tired. [Mother's] mental health issues interfere with her ability to safely parent her child. She is unable to verbalize how she would ensure her child is fed and kept on a consistent schedule. [Mother] has been unwilling or unable to participate in the development of a plan."

The report noted that Marshall had moved to an ICWA-approved placement in December 2012. He adjusted well to this placement and showed comfort in the presence of caretakers who would like to provide permanency.

On March 29, 2013, the review hearing was held and reunification services were terminated. Mother filed notice of intent to file a writ petition, but no petition was filed.

The social worker's July 2013 report for the selection and implementation hearing recommended a permanent plan of adoption and a 90-day continuance to consult as to whether a tribal customary adoption would be in Marshall's best interest. (See generally *In re H.R.* (2012) 208 Cal.App.4th 751, 759-764.) The tribe had not determined whether it would support a plan of adoption or tribal adoption.

The report noted that Marshall was in good health and doing well in his tribal home placement. Although mother's visitation previously had been sporadic, her monthly visits were consistent since the six-month review.

In July 2013, the selection and implementation hearing was continued to October 2013 to allow the tribe to consider tribal adoption. The six-month review was submitted on the social worker's report and other evidence. The court found that ICWA applied and identified adoption as the permanent plan. Mother appealed from this ruling.

In October 2013, the juvenile court ruled that termination of parental rights would be detrimental to the child in that it would interfere with Marshall's connection to his tribal community or membership rights. The court identified Marshall's permanent plan as placement with the caregiver with a specific goal of tribal adoption. Mother appealed

5

from this ruling. This court later dismissed both appeals for failure to raise any appellate issues. (*In re Phoenix H.* (2009) 47 Cal.4th 835.)

The social worker's March 2014 report for the postpermanent plan review stated that Marshall continued in his approved placement and that the providers were meeting his needs and capable of providing continued care and supervision. The current providers were open to a tribal adoption. The report stated that Marshall "presents as secure in their care and seeks them out for comfort and affection. His foster family sees him as a member of their family. He has been fully accepted as a member of the family. He has developed a close relationship with his foster parents and views them as his parents. He relates to his foster parents as his parents and appears completely comfortable in their home."

The report noted that mother was visiting Marshall on a monthly basis. She obtained housing and was living separately from father.

In April 2014, the matter was continued for two weeks to allow the tribe to discuss tribal adoption. Later that month, the matter was continued for 90 days at the request of the Agency. In July 2014, the Agency requested that a continued selection and implementation hearing be set. The tribe indicated that it supported a tribal adoption.

The social worker's report for the continued selection and implementation hearing and permanent plan review, filed on October 14, 2014, recommended that a permanent plan of adoption be ordered pursuant to the statutory provision for tribal adoption. The Agency requested a 120-day continuance to complete the procedures with the tribe. (§ 366.24, subd. (c)(6).)

The foster parents reported: "Marshall is starting toilet training. He is talking more and talking in sentences at times. Marshall is active; he loves playing with his trucks. He also enjoys playing baseball with his plastic ball and bat, and enjoys hitting the ball when his foster parents throw it. Emotionally, Marshall is a happy child who enjoys interacting with his foster parents and their extended family. Marshall loves to

dance and goes to Native American dance classes at the Redding Rancheria; he has performed dancing at several local Native American cultural events."

Mother was visiting Marshall once a month for two hours per session. Visits usually consisted of mother and child playing together. Both enjoyed the visits. The foster parents had met mother at different Native American events where she could interact with her son.

The foster parents had been approved as a tribal home. They had discussed with a tribal representative issues related to tribal adoption, their willingness to allow contact with mother if the tribe so requests per the tribal adoption, and the incorporation of tribal customs and traditions into their family life.

On October 20, 2014, mother's counsel filed a request to change court order using Judicial Council form JV-180.**3** Counsel stated that the March 29, 2013, order terminating services to the parents should be changed and that the juvenile court should "[t]ransition the child back into mother's care under a plan of Family Maintenance." Regarding allegedly changed circumstances, counsel declared: "Mother's life and medical condition have stabilized and improved. The attached medical records from Shasta Comm[unity] Health Center reflect that from [October 22, 2007] through [January 17, 2013], mother had considerable/frequent medical issues. The printout, dated [July 31, 2014], appears to reflect nothing beyond [January 17, 2013], with the ending diagnosis of anxiety. [(Citing mother's exhibit 1.)] A [January 7, 2014] statement from [the Shasta Community Health Center], notes mom is still on medications for her anxiety. [(Citing mother's exhibit 2.)]"

Mother's counsel stated that the change was in Marshall's best interest because "[m]other has had continued contact/visitation with the child. Her visits go well and she

---

**3** Further citations to forms are to the forms published by the Judicial Council of California.

7

believes there is a strong bond between herself and the child.  Returning the child to the mother's care would foster a reunified family and the preferred placement of the tribe."

Mother's exhibit 1 was a three-page "Problem List" from Shasta Community Health Center listing 125 medical codes and diagnoses; the first 75 entries were accompanied by dates.  Although the list was dated July 31, 2014, the most recent diagnosis (anxiety not otherwise specified) is dated January 17, 2013.  The oldest dated diagnosis is October 22, 2007; the remaining 50 entries are undated.

Mother's exhibit 2 was a January 7, 2014, letter from nurse practitioner Harold Ascherman of Shasta Community Health Center stating:  "To Whom It May Concern, [¶] [mother] has a history of moderate anxiety.  She is currently taking Klonopin/clonazipan 0.5mg three times a day."

Mother's exhibit 3 was a June 26, 2014, letter from Ascherman stating:  "To Whom It May Concern, [¶] [mother] is followed by Shasta Community Health Center for ongoing and significant gastric acid reflux.  She is currently taking numerous medications for this condition.  She has also failed numerous medications in the past.  She has had numerous diagnostic tests, and is pending further diagnostic testing.  Her symptoms appear to be increasing, and has been seen thru this facility and thru the local emergency rooms."

Mother's exhibit 4 was a two-page list of "Chronic Problems, Medications, and Allergies" from Shasta Community Health Center.  The list, dated July 31, 2014, included eight chronic problems, four medications prescribed between May 4, 2011 and April 23, 2014, and three allergies.

On October 24, 2014, the trial court filed form JV-183, "Court Order on Form JV-180."  The court completed part 3, which reads:  "The court orders a hearing on the form JV-180 request because the best interest of the child may be promoted by the request."  The form stated that a hearing would take place that same day.

In open court that day, the juvenile court stated: "The Court did receive this morning on my desk a [form] JV-180 request filed by [mother's counsel] on behalf of the mother. The Court calendared it for this morning and not for hearing on the JV-180 but for, basically, status so the Court could track it if necessary and hear argument from counsel as to why the Court should grant a hearing . . . pursuant to the JV-180 request."

The juvenile court also noted that it had received an e-mail communication from the tribal representative indicating that the tribe did not believe the JV-180 presented enough evidence to show any need to reverse the previous court order. The tribal representative confirmed this at the hearing.

Mother's counsel made an offer of proof that mother "has gone through all of th[e] steps" of learning "how to be a mother" and "believes at this point she would be able to properly mother a child." Counsel stated that mother would testify that her "medical issues . . . are continuing, but they have substantially subsided so they don't interfere with her ability to parent any further." Furthermore, "the anxiety had been a primary issue, and the chart notes from Shasta Community Health Center . . . would indicate that we have that under control." This created "a change of circumstances which would put her in a position to argue then that it would be in the best interest of the child to be returned to her care."

After hearing from all counsel, the juvenile court stated "the Court agrees that there isn't sufficient evidence for the Court to grant a hearing with respect to the request made pursuant to [form] JV-180, and the Court denies such request."

The juvenile court ruled: "[t]he request is denied because: No hearing set. No sufficient evidence presented."

Following this ruling, mother submitted on the balance of the issues before the court with respect to a tribal adoption.

9

DISCUSSION

Mother contends the juvenile court abused its discretion when it denied her request to change court order (section 388 petition) without holding an evidentiary hearing. We disagree.

A parent may bring a petition for modification of any order of the juvenile court pursuant to section 388 based on new evidence or a showing of changed circumstances.[4] "The parent requesting the change of order has the burden of establishing that the change is justified." (*In re Michael B.* (1992) 8 Cal.App.4th 1698, 1703.)

To establish the right to an evidentiary hearing, the petition must include facts that make a prima facie showing there is a change in circumstances and "the best interests of the child may be promoted by the proposed change of order." (*In re Daijah T.* (2000) 83 Cal.App.4th 666, 672-673; see *In re Zachary G.* (1999) 77 Cal.App.4th 799, 806; *In re Jeremy W.* (1992) 3 Cal.App.4th 1407, 1413-1414; Cal. Rules of Court, rule 5.570(e)(1).) " 'The parent need only make a prima facie showing to trigger the right to proceed by way of a full hearing. [Citation.]' [Citation.] 'A "prima facie" showing refers to those facts which will sustain a favorable decision if the evidence submitted in support of the allegations by the petitioner is credited. [Citation.]' [Citation.]" (*In re Daijah T.*, at p. 673.)

"In determining whether the petition makes the necessary showing, the court may consider the entire factual and procedural history of the case." (*In re Jackson W.* (2010) 184 Cal.App.4th 247, 258.) Further, when ruling on a petition to modify, the juvenile

---

**4**    Section 388 provides in relevant part: "Any parent . . . may, upon grounds of change of circumstance or new evidence, petition the court in the same action in which the child was found to be a dependent child of the juvenile court . . . for a hearing to change, modify, or set aside any order of court previously made or to terminate the jurisdiction of the court." (§ 388, subd. (a)(1).) The court must set a hearing "[i]f it appears that the best interests of the child or the nonminor dependent may be promoted by the proposed change of order . . . ." (§ 388, subd. (d).)

court exercises its sound discretion and, absent a showing of a clear abuse, the decision of the juvenile court will be upheld. (*In re Stephanie M*. (1994) 7 Cal.4th 295, 318-319; *In re Robert L*. (1993) 21 Cal.App.4th 1057, 1067.)

Where, as here, the petition is brought when services have been bypassed or terminated and the selection and implementation hearing is pending, the best interests of the child are of paramount consideration. (*In re Stephanie M*., *supra*, 7 Cal.4th at p. 317.) In such a case, the juvenile court looks not to the parent's interests in reunification but to the needs of the child for permanence and stability. (*Ibid*.; *In re Marilyn H*. (1993) 5 Cal.4th 295, 309.)

In this case, mother's four exhibits failed to make any prima facie showing that there had been a change in circumstances or that a change of order would promote Marshall's best interests. (*In re Daijah T*., *supra*, 83 Cal.App.4th at pp. 672-673.)

Mother contends her "offer of proof that [she had not been] prepared to have a child when her son was born, but she had gone through steps and was now able to properly care for a child[,] required exploration through an evidentiary hearing." But nothing in mother's offer of proof suggested how uprooting Marshall from his successful ICWA placement would address his needs for permanence and stability. (*In re Stephanie M*., *supra*, 7 Cal.4th at p. 317; *In re Marilyn H*., *supra*, 5 Cal.4th at p. 309.)

Mother relies on the social worker's October 2014 e-mail to the tribal representative stating that mother's visits with Marshall were positive and that he was benefiting from the love and attention of his birth mother as well as his current caregivers. But as mother recognizes, the e-mail also reveals that she had attended just six of the last 13 monthly visits that had been scheduled for her. Mother's counsel did not rely on the e-mail to show changed circumstances at the hearing in juvenile court. Even if this argument were timely, it would not require a different result here.

Mother relies on the tribal representative's response to the termination of reunification services. In an October 23, 2014, e-mail correspondence, the tribal

representative wrote, "[W]e . . . believe that it was a HUGE disservice to the family to discontinue active efforts. Here in the State of Alaska, the department must provide active efforts right up until the day of reunification, guardianship is finalized or termination of parental rights."

The tribal representative's concern appears to have been the California practice of discontinuing reunification services at the review hearing held several months prior to the selection and implementation hearing. Whether a "disservice" or not, the juvenile court terminated services at the point contemplated by our dependency scheme.

In sum, mother has not shown that the juvenile court's denial of her request to change the court order without a hearing was a clear abuse of discretion. (*In re Stephanie M.*, *supra*, 7 Cal.4th at pp. 318-319; *In re Robert L.*, *supra,* 21 Cal.App.4th at p. 1067.)

## DISPOSITION

The order denying mother's request to change a court order is affirmed.


           ROBIE          , Acting P. J.

We concur:


     MAURO       , J.


     HOCH        , J.