Filed 9/17/20  Certified for Publication 10/9/20 (order attached)

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re N.S., a Person Coming Under the Juvenile Court Law. | D077177 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. NJ14703) |
| v. | |
| C.V., | |
| Defendant and Appellant. | |


APPEAL from an order of the Superior Court of San Diego County, Michael Imhoff, Commissioner.  Affirmed.

Annie Greenleaf, under appointment by the Court of Appeal, for Defendant and Appellant.

Thomas E. Montgomery, County Counsel, Caitlin E. Ray, Chief Deputy County Counsel, and Tahra Broderson, Deputy County Counsel, for Plaintiff and Respondent.

C.V. (Mother) appeals from an order under Welfare and Institutions Code section 366.26[1] selecting adoption as the permanent plan for her son N.S. and terminating her parental rights.[2] N.S.'s father is a member of the San Pasqual Band of Mission Indians (the Tribe). The Tribe has been involved in this case since the juvenile court found that N.S. is an Indian child and that the Indian Child Welfare Act (25 U.S.C. § 1901 et seq.) (ICWA) applies.[3]

Mother contends (1) the Tribe's "decree" selecting guardianship as the best permanent plan option for N.S. preempts the statutory preference for adoption under section 366.26; (2) N.S.'s counsel breached his duties under section 317 and provided ineffective assistance of counsel by failing to discover what Tribal benefits or membership rights were available to N.S. before the termination of parental rights; (3) the court erred in finding that

---

[1] All further statutory references are to the Welfare and Institutions Code unless otherwise specified.

[2] N.S.'s father visited N.S. only once and is not a party to this appeal.

[3] "ICWA, enacted in 1978, was Congress's response to statistics showing a widespread practice of unwarranted removal of Indian children from their families by social services agencies. Congress declared that the policy behind the Act was 'to protect the best interests of Indian children and to promote the stability and security of Indian tribes and families.' (25 U.S.C. § 1902.) This was to be accomplished in part by the establishment of 'minimum Federal standards' governing the removal of Indian children from their families and the placement of such children according to preferences for homes reflecting Indian culture." (*Crystal R. v. Superior Court* (1997) 59 Cal.App.4th 703, 706.)
"In 2006, to increase compliance with ICWA, the California Legislature passed Senate Bill No. 678 (2005-2006 Reg. Sess.), codifying and elaborating on ICWA's requirements through revisions to several provisions of the Family, Probate and Welfare and Institutions Codes." (*In re Michael V.* (2016) 3 Cal.App.5th 225, 232, fn. 4.)

2

the Indian child exception of section 366.26, subdivision (c)(1)(B)(vi)(I) and (II) does not apply to preclude termination of parental rights; (4) there is insufficient evidence to support the court's finding beyond a reasonable doubt that continued custody in Mother's care would be a substantial risk to N.S.; and (5) the court erred in finding that the beneficial parent-child relationship exception of section 366.26, subdivision (c)(1)(B)(i) does not apply to preclude termination of parental rights.  We affirm.

FACTUAL AND PROCEDURAL BACKGROUND

In August 2012, when N.S. was 16 months old, the San Diego County Health and Human Services (the Agency) detained him and filed a petition under section 300, subdivision (b), after Mother's roommate found Mother unresponsive, lying in her own vomit with N.S. in his crib in the same room. Mother had been using prescription drugs and alcohol since January 1, 2012, and admitted that she had a history of using illegal drugs that began in 1993 and a history of alcoholism dating to 2004.  She also admitted that she was not stable enough to care for N.S.

The juvenile court assumed jurisdiction over N.S. and removed him from Mother's custody.  As noted, the juvenile court found that N.S. was an Indian child and that ICWA applied based on the father's membership in the Tribe.  N.S. was placed with the maternal grandparents about three weeks after he was detained.  He was returned to Mother's care on a trial visit in May 2013, but was removed again from Mother in September 2013 and placed with the maternal grandparents because Mother admitted to using methamphetamines, amphetamines, and alcohol since August 2013, and had used synthetic urine to pass a drug test.

In September 2014, the court ordered a permanent plan of legal guardianship, appointed the maternal grandparents as legal guardians, and

terminated dependency jurisdiction. The grandparents hoped that Mother would reunify with N.S., but they expressed their willingness to adopt him if Mother were unable to successfully reunify. The maternal grandfather passed away in 2017. N.S. has been with the maternal grandmother (Grandmother) without disruption since he was placed in her home in 2013.

In November 2018, Mother filed a petition under section 388 to change the juvenile court's visitation order. She alleged that Grandmother was not allowing her to have contact and visitation with N.S. "as per the order," and that she had not seen N.S. since December 26, 2016. She asked the court to allow her to have unsupervised and overnight visits with N.S. The court scheduled a hearing on Mother's petition for December 4, 2018, and on that date continued the hearing to January 3, 2019, to allow the Agency social worker time to assess Mother's request and provide a report to the court.

In its report regarding Mother's petition, the Agency recommended that the court maintain its previous orders. The Agency social worker met with Mother on November 29, 2018, at the Family Recovery Center (FRC), where Mother had been in residential substance abuse treatment for a month. Mother told the social worker that her "clean date" was September 22, 2018. She said that she had been struggling to arrange visits with N.S. for the past two years and had tried to contact him through regular mail, e-mail, and by telephone, but Grandmother had blocked the numbers that Mother called from. Mother said that she also tried to send care packages to N.S. with letters providing her contact information, but Grandmother never responded. Mother claimed that she had frequent visits with N.S. when the dependency case was open, but that Grandmother refused to allow visits once the guardianship was established.

After meeting with Mother, the social worker met with Grandmother and N.S. When she was able to speak with Grandmother alone, the social worker asked her why Mother's visitation with N.S. had lapsed. Grandmother said that the last visit had occurred in December 2016 and explained that she had to get a restraining order against Mother in January 2016 because Mother had threatened to physically harm her. She continued to allow regular visits with the mother that year, but throughout 2017, her husband was very ill and was in and out of the hospital. Mother came to the hospital to see Grandmother and N.S. and told them, "Don't worry. I'm just here to protect my inheritance." Grandmother did not think that Mother was in a stable place. Mother had been "in and out of different substance abuse programs 15 or more times."

Grandmother told the social worker that telephone messages from Mother could be pleasant or abusive and that Mother could "also be argumentative and twist words." Mother would call eight to 10 times a day from different and random telephone numbers and although Grandmother gave Mother rules regarding phone calls, she was constantly getting calls from strangers using different phone numbers in the middle of the night. The social worker asked about the packages that Mother reportedly sent to Grandmother's residence. Grandmother said that Mother sent packages in February 2017, March 2018, and April 2018, and that N.S. "correlates" Mother to receiving presents. The social worker reminded Grandmother that Mother still had parental rights and a right to visit N.S. The social worker scheduled a visit at FRC and informed Grandmother that she (the social worker) would be supervising visits, initially.

N.S. was in second grade and was doing well academically and socially at school. He enjoyed reading and playing with his friends and was enrolled

in extracurricular activities including soccer, basketball, and a Christian scouting group that Grandmother viewed as a way for him to be around positive male role models. The social worker asked N.S. about his life in Grandmother's home and he said, "Everything here is awesomely best!" When the social worker spoke privately with N.S., she asked him whether he had any worries. He said "no." She asked him how he felt about visiting with his mother and he said okay, but appeared hesitant. However, he said that he would be "okay" with a visit supervised by the social worker the following week at Mother's place.

The social worker supervised four visits between Mother and N.S. in December 2018. N.S. appeared nervous during the first visit. Mother greeted him affectionately and had activities planned for each visit. N.S. was very well behaved initially, but as he became more comfortable with the visits, he began to test limits and boundaries with Mother and needed more redirecting, reminding, and prompting about his behavior. Grandmother told the social worker that Mother had a history of allowing inappropriate behavior to continue rather than stopping it. The social worker's assessment was that Mother and N.S. generally enjoyed the visits but that Mother allowed some misbehavior without consequences.

The social worker's overall assessment was that Mother and Grandmother's relationship was strained and conflicted due to Mother's chronic substance abuse. Grandmother's position was that Mother had never been stable and that it was not beneficial for N.S. to be subjected to Mother's lack of consistency, stability, and sobriety. Mother's only desire was to build a relationship with N.S. Although Mother was in residential treatment and expressed a desire to successfully complete it, based on her past failed attempts to maintain sobriety, the Agency and Grandmother doubted her

6

ability to succeed. Grandmother was aware that she (Grandmother) had violated the court's orders by not following through on visitation. The Agency recommended that the court admonish Grandmother, but noted that N.S. was thriving in her care. The Agency recommended that he remain in her care and that Mother be allowed supervised visitation.

Grandmother filed a section 388 petition on January 3, 2019, requesting that the court reinstate dependency jurisdiction, change its order making guardianship N.S.'s permanent plan, and set a new section 366.26 hearing to determine the most appropriate permanent plan for N.S. Grandmother alleged that the proposed change of order would promote N.S.'s best interests and that Grandmother adopting N.S. would "afford [him] the greatest degree of permanency and stability."

At the hearing on January 3, 2019, the court "re-acquire[d] juvenile dependency jurisdiction[]" and appointed counsel to represent both Mother and N.S. Grandmother was represented by retained counsel. Maya Goodblanket, appeared at the hearing as the Tribe's ICWA representative and the court noted the previous finding that ICWA applied. The court continued the hearing on Mother's and Grandmother's section 388 petitions to January 17, 2019 "to allow counsel to provide proper notice to the Indian tribe of their respective requests."

At the hearing on January 17, 2019, Mother withdrew her section 388 petition and the court reiterated its order allowing her supervised visitation. The court gave the social worker discretion to expand Mother's supervised visits with the concurrence of N.S.'s counsel. The court granted Grandmother's section 388 petition and set a section 366.26 hearing for May 16, 2019.

7

In February 2019, Mother began participating in dependency drug court. Her compliance in the program was good until she submitted a diluted test in April 2019, which was viewed as a positive result. On May 3, 2019, Mother withdrew from the drug court program.

Agency social worker Steffi Navarro was assigned to the case in February 2019 and prepared the Agency's report for the May 16 section 366.26 hearing. In the initial report filed in April 2019, the Agency's recommendation was that the court select tribal customary adoption (TCA)[4] as N.S.'s permanent plan. When Navarro first met with Mother in February 2019, Mother told her that she had been sober for five months and said that she had learned coping skills and changed her lifestyle while participating in therapy and treatment.

Mother had been having weekly one-hour supervised visits with N.S. She asked about increasing the frequency of visitation. Visitation had not changed because N.S. had repeatedly expressed that he did not want more visitation and asked that it remain at one hour per week. At the time she wrote her report, Navarro had supervised five visits between Mother and N.S. at a family visitation center between February 21 and April 18, 2019. Mother consistently brought food, toys, games, and activities to the visits, although she had been advised by the visitation center staff to limit the amount of food and gifts and to focus more on bonding with N.S. Mother showed affection to N.S. throughout the visits by frequently kissing, hugging, and expressing her love for him. N.S. was observed to be receptive to

---

[4]    The statutory definition of "tribal customary adoption" is "adoption by and through the tribal custom, traditions, or law of an Indian child's tribe. Termination of parental rights is not required to effect the tribal customary adoption." (§ 366.24, subdivision (a)(1).)

Mother's affection but occasionally appeared to be frustrated and resistant to it. He sometimes did not respond appropriately to Mother's attempts to redirect him.

Navarro observed that overall, the comfort level between Mother and N.S. had improved over the course of the visits, but she continued to see a struggle between Mother's redirection and N.S.'s compliance. Navarro noticed that N.S. had a nervous twitch that occurred mainly during his visits with Mother. The psychologist who evaluated N.S. confirmed that he appeared to have a twitch when he became anxious.

In addition to the weekly visitation, Mother had two scheduled telephone calls with N.S. each week. However, as of April 2, 2019, Mother had been calling only once a week, at N.S.'s request. Regarding the phone calls, Mother said to Navarro, "I can tell he is not excited. He tells me before the phone call that he doesn't like to talk on the phone."

N.S. told Navarro that he enjoyed his visits with Mother and that his favorite part was the playground and playing soccer. He had been observed telling Mother that he loved her, but did not appear distressed at the end of visits. When asked whether he wanted more visits or time to visit, N.S. said he was okay with one visit and did not want any more. N.S.'s counsel told Navarro that N.S. had told her the same thing.

Regarding telephone calls, N.S. told Navarro that he did not like to talk on the phone and preferred one weekly call rather than two. He had not expressed that to Mother because he did not want to hurt her feelings, but he agreed to let Navarro explain it to her. Navarro asked N.S. if he would like Mother to attend his extracurricular activities like karate. He expressed that he would not and added, "I don't like anything different. I want everything to stay the same." Navarro also asked N.S. why he appeared to not listen to

Mother's redirections during visits. He responded that he just wanted to have fun when he visited with Mother.

Contrary to what N.S. communicated to Navarro, Mother told Navarro on March 7, 2019 that N.S. had requested more visits with Mother and had asked about living with Mother. On March 25, Navarro asked N.S. whether he had ever mentioned wanting to move in with Mother. He told Navarro, "I never said that. I don't recall saying that." Navarro asked N.S. how he felt about adoption and N.S. said, "Happy!" She then asked him how he felt about being adopted by Grandmother and he said, "Excited! I want her to adopt me." During a psychological evaluation, N.S. said, "I'm not ready to live with [Mother]." When asked why, he said, "I would really miss my grandma."

Navarro reported that Grandmother and the Tribe were requesting, and the Agency was recommending, a TCA for N.S. During a child and family team (CFT) meeting in April 2019, Goodblanket, the Tribal ICWA representative, expressed concern that N.S. was not becoming involved or connected with the Tribe and its traditions. At that meeting, Grandmother inquired about the possibility of receiving a newsletter from the Tribe that would provide information about the Tribe's events. Navarro reported that Grandmother understood the responsibilities of a TCA and had a strong desire to adopt N.S. and continue to provide him a safe and nurturing home. She had shown over the past six years that she was willing and able to meet his physical, emotional, and developmental needs.

N.S.'s court appointed special advocate (CASA) also filed a report for the section 366.26 hearing. The CASA believed that N.S. was thriving and that all of his needs were being met in Grandmother's care. While it was evident that Mother loved N.S., the CASA thought that Mother's visits

should remain supervised to ensure N.S.'s safety and well-being. The CASA believed that Mother had neglected to acknowledge or take responsibility for how her behavior was unsettling and potentially unsafe for N.S., who had stated that he did not want his visits with Mother to be expanded. The CASA agreed with the Agency's recommendation for a TCA.

In an addendum report for the section 366.26 hearing filed on May 14, 2019, Navarro reported that she had visited N.S. at school on May 9, 2019, and asked him if he wanted more visitation with Mother. N.S. said he would like to have a second one-hour visit during the week, but he did not want to increase the time of the visits to more than one hour. He confirmed that he still wanted Grandmother to adopt him, and that although he was requesting an additional weekly visit with Mother, he did not want to live with her.

In addendum reports filed on May 14 and 15, 2019, the Agency requested a 90-day continuance of the section 366.26 hearing to complete its efforts to locate the father and provide him notice of the hearing. At the hearing on May 16, 2020, the court granted the Agency's request for a continuance and set the section 366.26 hearing for August 19, 2019.

In an addendum report filed on August 16, 2019, Navarro reported that the Agency's recommendation was termination of parental rights and adoption instead of TCA. Goodblanket had notified Navarro by e-mail on August 13 that the Tribe was selecting guardianship for N.S.'s permanent plan. Navarro contacted Goodblanket by phone and asked whether TCA was "completely off the table" for the Tribe. Navarro explained that although the Tribe's input and recommendation were valuable to the Agency, the Agency would be recommending adoption, but if TCA were an option for the Tribe, the Agency would recommend TCA because the Agency believed that

11

Mother's involvement in N.S.'s life was important.[5] Goodblanket told Navarro that the Tribe was currently seeking guardianship, but that TCA was not completely off the table.

The Tribe sent the Agency a letter dated August 13, 2019, stating that after careful consideration of N.S.'s best interests, it believed that guardianship with Grandmother was the best permanent plan option for N.S. The letter stated that the Tribe did not feel that TCA was in N.S.'s best interests "due to concerns of the rights and responsibilities that would be listed in the TCA Order not being adhered to by [Grandmother]. These include but are not limited to: regular visitation and contact with the birth mother, informing [N.S.] of his Native American heritage, making reasonable efforts to have [N.S.] participate in cultural and/or traditional activities of San Pascual, making reasonable efforts to enroll [N.S.] in native language classes/programs, meet with the San Pasqual Tribe within 30 days of [N.S.'s] eighteenth birthday, and preserving familial and cultural ties to the San Pasqual Tribe and extended family residing both on and off the San Pasqual Indian Reservation."

In its assessment/evaluation for the permanency hearing, the Agency explained that it was not opposed to TCA with the Tribe's concurrence, but

---

[5] Navarro reported that since the May 16, 2019 hearing, Mother and Grandmother had "made great strides to rebuild their relationship, all for the best interest of [N.S.]" Grandmother had "expressed that she sees the value and importance [Mother] has in [N.S.'s] life and stated she continues to encourage their relationship as long as it is in the best interest of [N.S.]. In addition, [Grandmother had] willingly supervised and supported an extra visit/outing between [Mother and N.S.] while [Grandmother] supervised." Grandmother reported having "more communication with [Mother] via email, overall reporting that the relationship between them is growing and improving."

because the Tribe was requesting guardianship, the Agency was changing its recommendation to termination of parental rights. Under the circumstances, adoption appeared to be the best permanent plan for N.S. and the plan that he continued to request.

In June 2019, N.S. told Navarro that he continued to want Grandmother to adopt him and did not want to live with Mother, but he wanted to continue to have visitation with Mother even after being adopted by Grandmother. He said he was confused as to why the adoption was taking so long. He wrote the court a letter stating, "Dear judge I REALLY Want to get adopted By my grandma Because Shes nice great[.] [I']ve lived with her a long time please let my grandma adopt me. I enjoy the visits with mom. Let my grandma adopt me. – [N.S.]"

On August 19, 2019, Mother filed a new section 388 petition requesting that the court terminate the legal guardianship, reinstate reunification services to transition N.S. back to her care, and then offer family maintenance services. As changed circumstances, Mother alleged that she had addressed the issues that led to the filing of the original dependency petition and removal of N.S. from her care. She completed the FRC inpatient substance abuse program in January 2019, which included weekly individual therapy, and her drug tests were all negative during the program. After FRC, she completed an intensive three-month outpatient program followed by another three-month outpatient program, during which she had all negative drug tests except for one that was too diluted to get an accurate reading. All of her subsequent tests were negative and a hair follicle test

from June 5, 2019, was negative for drugs and alcohol.[6] Since leaving FRC, she had been residing in North County Sober Living and participating in various other substance abuse programs and meetings, and had been testing negative biweekly. She had also completed a parenting class through the Indian Health Council, Inc.

Mother alleged that returning N.S. to her care would be in his best interests because they had developed a strong bond despite several years of Grandmother's not allowing visitation. The Agency's reports showed that Mother's visits with N.S. had gone well, and that N.S. had asked for more visits and wanted to continue his relationship with Mother. Mother alleged that she could continue to facilitate contact with Grandmother and other maternal relatives and that she was "also dedicated to [N.S.'s] understanding his paternal side of this family and his heritage as a child of the San Pasqual Band of Mission Indians." She claimed that she had worked closely with the Tribe, which did not endorse adoption by Grandmother, and that she "would like to continue to facilitate [N.S.'s] knowledge and connection to his rich cultural heritage, which is essential to a Native American child." She noted the Tribe's concerns that the Grandmother had not allowed Mother visitation and had not made efforts to inform N.S. of his Native American heritage and involve him with the Tribe.

At the hearing on August 19, 2019, the juvenile court found that Mother had carried her prima facie burden on her section 388 petition. The court set the petition for an evidentiary hearing to precede the section 366.26 hearing on September 27, 2019. On September 19, 2019, Mother advised the

---

[6] Mother did the hair follicle test to prove that she had not used any controlled substances at the time she submitted the diluted urine sample in April 2019.

court that the Tribe's representative was not available on September 27 and asked the court to continue the contested hearing. The court granted Mother's request and continued the trial date to November 8 "to allow the Tribal representative to be present."

On November 7, 2019, Agency social worker Lisa Olimpio filed an addendum report recommending that the court deny Mother's section 388 petition, proceed with the section 366.26 hearing, and order adoption as N.S.'s permanent plan. Addressing whether granting Mother's petition would be in N.S.'s best interests, Olimpio noted that N.S. was an "incredibly articulate" eight-year-old boy who read at a fifth grade level and "appear[ed] to have cognitive understanding way above his chronological age." N.S. had consistently expressed to his Grandmother, the Agency social workers, his attorney, the Tribal representative, and his psychological evaluator that he wanted to be adopted and that he did not want to live with Mother, although he wanted to continue to visit her.

Olimpio noted that the Tribal representative had told Navarro that the Tribe had "little to no" contact with Grandmother during the period of her guardianship. Grandmother told Olimpio that the Tribe had not reached out to her, and that even when she requested information during a CFT meeting about Tribal activities that N.S. could attend, the Tribe had not responded to her. Olimpio reported that "the Tribe equates this apparent lack of contact with lack of interest, which the grandmother states is not true."

Olimpio's report emphasized that the Agency strongly favored TCA as the best plan for adoption because it would facilitate the Tribe's involvement in N.S.'s life. Olimpio stated, "A permanent plan of [TCA] makes the most sense in this case, whereby the Tribe would have on-going input into promoting [N.S.'s] Native American heritage and a TCA would provide for

15

contact with [Mother]." Olimpio noted that the Tribe's letter requesting guardianship rather than TCA stated that the Tribe had " 'concerns' that the rights and responsibilities that would be listed in a TCA would not be adhered to by [Grandmother], yet they cite no evidence for their concerns."

The Agency's position was that if the Tribe was concerned, it was encouraged to "to take a stance of offering support and encouragement to [Grandmother] so that they might have more input into helping [Grandmother] include more Native American culture into their daily lives. The plans of Guardianship or standard adoption do not leave [the Tribe] in much of a position to interact with [N.S.] and [Grandmother] while TCA would, in many ways. TCA would include the 3 varied positions in this case: [Mother] would be able to continue contact [with N.S.], the Tribe would have some input into encouraging and strengthening Native American culture and TCA would provide the permanence of adoption for [N.S.], which he is asking for." Olimpio noted: "The Tribe has apparently stated that they do not have the staff to monitor a TCA, yet this Tribe continues to promote TCA's with this Agency in other cases; I have personal experience with other cases I have worked, that have TCA as a permanent plan with this Tribe."

Olimpio reported that she had been referred to an out-of-county Indian expert, Richard England, to provide a declaration assessing the Agency's proposed plan of adoption. She stated that the section 366.26 hearing would have to be continued because England had informed her that he needed 10 more working days to review various materials that he had requested in order to make his assessment.

In her overall assessment and evaluation, Olimpio reiterated that the Agency recommended that Mother's section 388 petition be denied based on N.S.'s best interests. She reiterated that the permanent plan of TCA would

16

best "incorporate everyone's interest: the Tribe, [N.S.] and [Grandmother]." She asserted that "[t]he Agency would support this wholeheartedly. However, the Tribe is not open to TCA and instead, recommended keeping the permanent plan of Guardianship." Consequently, the Agency's recommendation was adoption with termination of parental rights.

Goodblanket filed the Tribe's report and recommendations for the November 8, 2019 hearing. The Tribe did not support Mother's section 388 petition but continued to recommend guardianship as N.S.'s permanent plan. The Tribe believed that guardianship was in N.S.'s best interests because he had stability in Grandmother's home. However, the Tribe also believed that Mother was capable of maintaining sobriety and the Tribe "would be supportive of a [section] 388 [petition] with a minimum of 6 more months of sobriety."

Responding to Olimpio's promotion of TCA as the best plan, the Tribe acknowledged that although an explicit visitation schedule could be written into a TCA, guardianship would also allow Mother visitation, which the Tribe would recommend. And although TCA would allow the Tribe to have some input into encouraging and strengthening Native American culture with N.S., the Tribe had "reason to believe this would not be followed" because of Grandmother's lack of initiative since the beginning of the case. The Tribe stated that "there [were] no known efforts of [Grandmother] reaching out to the Tribe to encourage or strengthen [N.S.'s] ties to his Native American culture." Goodblanket noted that when she spoke with Grandmother in May 2019 about what would be included in a TCA order, Grandmother stated that she did not understand the amount of the Tribe's involvement and hesitated about N.S.'s being able to attend Tribal events and classes. She also expressed unwillingness to be responsible for visitation between N.S. and

17

Mother. Regarding permanency, the Tribe agreed that a TCA would provide the permanence that N.S. was asking for, but the Tribe was "comfortable with the level of stability and permanency [N.S.] has through Guardianship." The Tribe stated that it had remained consistent with its preference for guardianship and had "not been in support of, nor in agreement of adoption of [N.S.], dating to 5/15/19."

On November 8, 2019, the court held the evidentiary hearing on Mother's section 388 petition and continued the section 366.26 hearing to December 13, 2019. The court received in evidence the Agency's reports that it had prepared for the May, August, and November hearings and heard testimony from Mother and several witnesses whom Mother called to testify in support of her petition. After hearing argument from counsel for Mother, Grandmother, N.S., and the Agency, the court found that Mother had met her burden of showing changed circumstances, but that she had not met her burden of showing that it would be in N.S.'s best interests to place him with Mother. Accordingly, the court denied Mother's petition, but gave the social worker discretion to allow Mother to have short unsupervised daytime visits with N.S. with the concurrence of N.S.'s counsel.

On December 12, 2019, Olimpio filed the Agency's addendum report for the section 366.26 hearing on December 13. The Agency continued to recommend adoption for N.S.

Grandmother was reluctant to move to unsupervised visitation. Olimpio told Grandmother that she (Olimpio) would have to ask N.S. how he felt about unsupervised visits before they would begin. Olimpio met with N.S. alone and reported that he was enthusiastic about having unsupervised visits with Mother and had no fears about being alone with her. N.S.'s counsel concurred in allowing the unsupervised visits. The next day,

18

November 26, 2019, N.S. and Mother had an unsupervised visit during which they had lunch together at the restaurant where Mother worked and then walked to nearby stores for the rest of the visit. Mother reported that the visit was "wonderful." Mother had additional unsupervised visits with N.S. on December 8 and December 10, 2019. When Olimpio met with N.S. on December 12, he reported with a smile that the unsupervised visits were going well and that he enjoyed them.

Olimpio asked N.S. about his understanding of the difference between adoption and guardianship. N.S. understood that with adoption he would stay with Grandmother and Mother could not try to get him back and with guardianship he would still be with Grandmother but Mother could try to get him back with her. Olimpio reminded N.S. that with adoption Grandmother could stop all visits with Mother. N.S. said, "But I know she would never do that." Olimpio told N.S. that Grandmother had stopped visits in the past and obtained a restraining order against Mother to stop visits. N.S. responded, "No she didn't."

Olimpio asked N.S. what his future would look like if he were a magician and could make it any way he wanted. N.S. said he would be adopted and Mother would keep visiting him and he would like her to spend the night at his house but he did not want to spend the night at her house. Olimpio asked whether he ever thought about living with Mother in the future or spending the night at her house and told N.S. that she knew that Mother wanted that. N.S. continued to say "no."

Olimpio also asked N.S. about his Tribal heritage and whether he knew which tribe he was connected to. He said he could not recall. Olimpio told him the name of the Tribe but he had no memory of having heard it before. He had never been to the reservation or to an American Indian museum in

19

San Diego County but he had books about Native Americans. Olimpio asked whether he had any questions about his Tribal heritage and he said "no."

The Agency's report included, as an attachment, the declaration of ICWA expert England. England's knowledge of this case was based on his review of the Agency's reports for the May 16 and August 19, 2019 hearings. England believed that it was important to respect the Tribe's recommendations regarding permanency plans of Indian children and that supporting the Tribe's recommendation of guardianship as N.S.'s long-term plan was in N.S.'s best interests and would provide Mother the opportunity to reunify with him at some point. He noted the Tribe's concern that if N.S. were adopted by Grandmother through a TCA, he could be cut off from his Tribal family and extended Tribal family. Although Mother is not Native American, England averred that she is familiar with the Tribe and can access available resources and support to ensure that N.S. maintains his connection to the Tribe. England opined that termination of parental rights "will impact [N.S.'s] ability to have a connection to his Tribe and to learn about this part of who he is."

The Agency also attached to its report a declaration prepared by Mother's Indian expert Halona Alexander. Alexander had reviewed the Agency's reports and the Tribe's letter recommending guardianship, spoken with Goodblanket and Mother's counsel, and met with Mother. Her opinion was that a state adoption and termination of parental rights would be detrimental to N.S. Although Grandmother provided N.S. a stable home, which the Tribe highly valued, adoption by a non-Native family member who had not demonstrated a commitment to exposing N.S. to his tribal culture would substantially interfere with N.S.'s connection to the Tribe, his understanding of his identity and culture, and potentially his "ability to make

20

future choices regarding his relationship to his Tribe that would provide him with a cultural identity and sense of belonging." Alexander concluded: "Given the history that led to the enactment of the ICWA and the realization by Congress that children are essential to tribes' survival, I believe honoring the San Pasqual Tribe's selection of guardianship in this case is necessary under the ICWA."

In the Agency's report, Olimpio noted that Grandmother had been criticized for not placing a stronger emphasis on N.S.'s Tribal heritage and educating him about it. However, Olimpio further noted that Grandmother had stated that she was presently willing to do this and had requested guidance on the issue. Olimpio reiterated that "the best fit for this case at this time seems to be TCA, but this is not the preference of the Tribe." Consequently, the Agency continued to support N.S.'s request that he be adopted by Grandmother.

At the contested section 366.26 hearing on December 13, 2019, the court proceeded with Mother's case-in-chief but suspended the Agency's case-in-chief and continued that portion of the hearing to January 14, 2020, because England was not available to testify on December 13. On December 13, the court received in evidence the Agency's reports that it prepared for May, August, November, and December 2019 hearings; Olimpio's curriculum vitae; and Alexander's curriculum vitae. The court heard testimony from Olimpio, Alexander, and Goodblanket.

Olimpio testified that Grandmother seemed receptive to engaging in activities with N.S. that would promote his Indian heritage, such as taking N.S. to Native American museums. However, Grandmother was confused about how often she had to engage N.S. in such activities and was concerned about how she would fit them into her busy schedule of other activities with

N.S.  Grandmother told Olimpio that the Tribe had not attempted to contact her during the guardianship until Mother filed her section 388 petition.

Goodblanket testified that when she spoke with Grandmother at the April 2019 CFT meeting and in a telephone conversation in May 2019, she told Grandmother that she (Goodblanket) could be a point of contact for Grandmother to find out about upcoming Tribal events.  Grandmother had asked to receive a newsletter.  In December 2019, Goodblanket discussed with Grandmother ideas about involving N.S. in Tribal activities and taking him to museums.  Grandmother mentioned that N.S. was reading what sounded to Goodblanket like a fictional book about the relationship between a pioneer and Indian boy.  Goodblanket got Grandmother's e-mail address and told her that she would speak with the Tribe and see if there was a way for Grandmother to get on a mailing list for the Tribe's activities.  The Tribe did not have a mailing list but they gave Goodblanket their website address and told her about a Christmas party that Grandmother was invited to attend. Goodblanket passed that information on to Grandmother.

Goodblanket further testified that if N.S. were adopted, the Tribe would no longer recognize him as an Indian child because a state adoption would sever all of his biological ties to the Tribe.  Consequently, he would not be eligible for enrollment in the Tribe if the enrollment criteria would at some point otherwise make him eligible.[7]  To her knowledge, N.S. was not presently eligible for enrollment in the Tribe; there would have to be a change in the Tribe's rules regarding enrollment for him to be eligible to enroll.

---

[7]     Goodblanket testified that the Tribe has enrolled members and non-enrolled members, and that N.S. is considered a member of the Tribe but is not an enrolled member.

On January 14, 2020, the court heard testimony from England and received in evidence Mother's section 388 petition and a handwritten letter from N.S. as an offer of proof of his anticipated testimony, as stipulated to by all counsel. The parties also stipulated that if Olimpio were called to testify at that hearing, she would testify that during her last in-person meeting with N.S., he asked for overnight visitation with Mother. However, in the same conversation, N.S. reiterated that he wanted Grandmother to adopt him.

After hearing argument from counsel for the Agency, Mother, Grandmother, and N.S., the juvenile court issued its ruling. The court began by noting that "this case does illustrate the tension that exists between two sovereign states: the Indian tribe, which is a separate sovereign, and the state of California, which is a separate sovereign."[8] The court observed that Grandmother "has shown that she is well oriented towards what's in the best interests of this child. If he has Indian heritage, then [Grandmother], I think, will recognize that and assist him. Certainly, the family could rally around him and let him know that."

Regarding the Tribe's role in fostering N.S.'s involvement with the Tribe, the court felt that "it [had] to be stated" that "up until the time the Tribe utilized Ms. Goodblanket to come in and address these issues, the Tribe had its own responsibilities to reach out to [N.S.] and see how he was doing. I don't mean that as criticism of the Tribe, but I can't ignore the fact that if we're looking at the competing tensions of the culture, that the court should be gauging not just the best intentions and motivations of the respective parties, but also the concrete actions that they took in order to advance what

---

[8]    The reporter's transcript is printed in all capital letters. We have modified all quotations from that transcript to reflect conventional capitalization.

they are sincerely asking the court to recognize."  In other words, the court considered not only the Tribe's stated interest in having a connection with N.S., but the extent to which the Tribe had taken, or failed to take, concrete actions to foster that connection.

The court found that N.S. was specifically adoptable, and also found, by clear and convincing evidence, that none of the circumstances listed in section 366.26, subdivision (c)(1)(B) that would make termination of parental rights detrimental to N.S. exist.  Regarding the beneficial parent-child relationship exception to adoption, the court found that the stability in N.S.'s placement with Grandmother outweighed the benefits that he had gained from his contact with Mother and, therefore, "it would not be in his best interests to promote or facilitate a mother-child relationship."

The court noted the following two Indian child exceptions to adoption specified in section 366.26, subdivision (c)(1)(B)(vi)(I) and (II):  "(I) Termination of parental rights would substantially interfere with the child's connection to his or her tribal community or the child's tribal membership rights[;]" and "(II) The child's tribe has identified guardianship . . . [as a] planned permanent living arrangement for the child."

Regarding substantial interference with N.S.'s connection to the Tribe, the court found that "once [Grandmother] is properly informed, once the expectations are concretely articulated, . . . she will encourage [N.S.] to learn about his heritage."  The court further found that given N.S.'s development, maturity, and curiosity, he would not "permit anybody [to] dissuad[e] him from making up his own mind as to not just his Indian heritage, but how it fits into his life."  Thus, the court concluded that there was not a compelling reason not to terminate parental rights based on a substantial interference with N.S.'s connection to the Tribe.

24

Regarding the Tribe's identification of guardianship as the best permanent plan for N.S., the court believed that N.S.'s "guardianship was a very vital tool and opportunity for him to get to this point." However, the court asserted that, "merely identifying guardianship to maintain the status quo would not recognize the increasing, the deep, the published connection [that N.S.] has with his grandmother." The court found that in light of N.S.'s "current developmental progression and attachment to the grandmother," guardianship was not in his best interests; therefore, the Tribe's identification of guardianship as N.S.'s permanent plan had not "been established as a compelling reason not to terminate parental rights."

The court then found beyond a reasonable doubt that "under 25USC1912(f)," continued custody by Mother would likely result in serious emotional or physical damage to N.S. The court terminated parental rights and referred N.S. to the Agency for adoptive placement.

## DISCUSSION

### I.

*The Tribe's Preference for Guardianship Does not Preempt the Preference for Adoption Under section 366.26*

Mother contends that the Tribe's "decree" selecting guardianship as the best permanent plan option for N.S. preempts the statutory preference for adoption under section 366.26. What Mother refers to as the Tribe's "decree" is the letter dated August 13, 2019 from the Chairman of the Tribe to the Agency stating that the Tribe believed that guardianship with Grandmother was the best permanent plan option for N.S. Mother argues that because the Tribe's decree directly conflicts with California's statutory preference for termination of parental rights and adoption over other permanent plan

25

options under section 366.26, subdivision (b), it preempts California's preference for adoption.

In support of this contention, Mother cites authority that Native American tribes are sovereign nations (*Campo Band of Mission Indians v. Superior Court* (2006) 137 Cal.App.4th 175, 181) and, as such, they have higher status and authority than states. (*In re M.M.* (2007) 154 Cal.App.4th 897, 908-909). She notes that the United States Supreme Court has held that " ' "absent governing Acts of Congress," a State may not act in a manner that "infringe[s] on the right of reservation Indians to make their own laws and be ruled by them." ' " (*Three Affiliated Tribes of Ft. Berthold Reservation v. Wold Engineering, P.C.* (1986) 476 U.S. 877, 890.) She maintains that this principle is exemplified in 25 United States Code section 1915(c) of ICWA, which provides that "if the Indian child's tribe shall establish a different order of [adoptive, preadoptive, or foster care placement] preference by resolution, the agency or court effecting the placement shall follow such order . . . ."[9] Mother argues that this provision recognizes the inherent authority that the Tribe possesses in determining what is best for the Tribe's children. Mother further argues that federal preemption under the supremacy clause of the United States Constitution applies in this case because there is a conflict between state law and federal law (conflict preemption), and the state law frustrates the purpose of the federal law

---

[9] 25 United States Code section 1915(a) and (b) list options for adoptive placement and foster care or preadoptive placement in order of statutory preference. 25 United States Code section 1915(c) addresses an Indian tribe's ability to establish a different order of preference by resolution. In the present case, the Tribe did not establish an order of preference for placement by resolution.

(obstacle preemption), citing *Akopyan v. Wells Fargo Home Mortgage, Inc.* (2013) 215 Cal.App.4th 120, 138.

Although Mother's federal preemption argument is necessarily based on conflict or inconsistency between ICWA (federal law) and California's juvenile dependency statutes (state law), the direct conflict that she addresses is the conflict between the Tribe's preference for guardianship as N.S.'s permanent plan and the state law preference for termination of parental rights and adoption. Mother argues that the state's legislative preference for adoption as a child's permanent plan, unless a specific statutory exception applies, "frustrates the purpose of the tribal cultural tenet that parental rights should remain intact." She maintains that termination of parental rights is antithetical to the cultural beliefs of the Tribe and many other Native American tribes, and that the Tribe has stated that its selection of guardianship as the best plan for N.S. is based on its on its cultural policy that it is in the best interests of children to provide parents with additional opportunities for reunification even when it is outside the state statutory timeframes.[10] She asserts that because the state's statutory preferences for permanent plans conflict with "the Tribe's laws and tenets," the doctrine of preemption applies, and the state court is barred from overriding the Tribal decree. In other words, Mother contends that the court

_____

[10] In support of that representation, Mother cites the statement in the Tribe's written report that "[t]he Tribe is committed to the reunification of their families, even when that is outside of the legal timeline of the Court." She also cites Goodblanket's testimony that "this tribal council believes in second chances. This tribal council believes in Mother's—all of her efforts in the last year of maintaining sobriety and all of those things are part of the reason why they wanted to leave it in guardianship, to give her an opportunity to potentially become [N.S.'s] full parent again."

lacked the authority to order any permanent plan other than the one that the Tribe selected for N.S.

We disagree that the Tribe's letter selecting guardianship as the best permanent plan option for N.S. precludes the court from ordering a different plan. The Agency contends that Mother waived the right to raise this contention on appeal because she conceded the issue at the section 366.26 hearing. The Agency's contention has merit. At the section 366.26 hearing, the court raised the issue as follows: "I think the legal issue was whether or not the tribe had an unquestioned, unfettered position to demand a legal guardianship, or whether, under state law, it comes under the natural statutory scheme where the court would have to consider it within the context of a compelling reason."

The Agency's counsel told the court that the following two cases he had cited to the court addressed that issue: *In re H.R.* (2012) 208 Cal.App.4th 751 (*H.R.*) and *In re T.S.* (2009) 175 Cal.App.4th 1031 (*T.S.*). The court stated that it had read those cases but believed that Mother's counsel "wanted to argue otherwise." Mother's counsel stated, "No, your honor. I believe that the Tribe doesn't have automatic veto power." The court then asked counsel for the other parties to weigh in. Grandmother's counsel stated, "I agree. I've read those cases, as well, your honor, and I think the court has the authority to review what the permanent plan ought to be, and it's not automatically got to be a guardianship because the [T]ribe says they want guardianship." N.S.'s counsel concurred and said that he thought that *H.R.* was "directly on point." Thus, Mother's counsel expressly agreed that the Tribe did not have "automatic veto power" over whatever permanent plan the court ordered.

28

It is settled that an appellant waives or forfeits the right to challenge a ruling on appeal by agreeing with or acquiescing to the ruling at trial. (*Hood v. Gonzales* (2019) 43 Cal.App.5th 57, 70; *In re A.S.* (2018) 28 Cal.App.5th 131, 151 [acquiescence to the scope of the section 366.26 hearing forfeited parents' right to claim on appeal that the court improperly limited the scope of the hearing].) Because Mother expressly agreed at trial that the juvenile court was not required to order the permanent plan that the Tribe selected, she has forfeited the right to claim on appeal that the court was required to order guardianship as N.S.'s permanent plan because the Tribe selected that plan.

In any event, Mother's argument that the Tribe's permanent plan choice "preempts" the state law permanent plan preference for adoption and termination of parental rights is without merit. There is no conflict between state and federal law that raises federal preemption concerns because under both ICWA and the state statutory dependency scheme, the state court has jurisdiction to select N.S.'s permanent plan and is not required to order whatever plan the Tribe selects.

Under 25 U.S.C. section 1911(b), a dependency case that involves an Indian child not domiciled or residing within the reservation of the child's tribe remains in state court unless a parent, the tribe, or the Indian custodian petitions to transfer the proceeding to the jurisdiction of the tribe; the court does not find good cause not to transfer the case; neither parent

objects to the transfer; and the tribe does not decline the transfer.[11] Welfare and Institutions Code section 305.5, subdivision (d) similarly provides that "[i]n the case of an Indian child who is not a ward of a tribal court or subject to the exclusive jurisdiction of an Indian tribe, . . . the state court shall transfer the proceeding to the jurisdiction of the child's tribe upon petition of either parent, the Indian custodian, or the child's tribe, unless the state court finds good cause not to transfer." Thus, under both federal and state law, jurisdiction remained with the state juvenile court in this case because no one petitioned to transfer the case to the jurisdiction of the Tribe.

Under California's dependency scheme TCA is the preferred permanent plan for an Indian child *if the child's tribe recommends TCA.* (*H.R.*, *supra*, 208 Cal.App.4th at pp. 761-764.) "Absent some evidence of countervailing detriment to the minor that the [juvenile] court, in its discretion, concludes would result from this form of adoption, the default in the case of an Indian child is [TCA]." (*Id.* at p. 764.) However, even when a tribe has selected TCA, the court may exercise its discretion to reject TCA as the child's permanent plan and order a different plan, including traditional adoption with termination of parental rights. (*Ibid.*) "[N]othing in the [statutory provisions regarding TCA] suggests that the Legislature intended to alter the long-standing rule that the selection of a permanent plan is vested in the

---

11      25 U.S.C. section 1911(b) states: "In any State court proceeding for the foster care placement of, or termination of parental rights to, an Indian child not domiciled or residing within the reservation of the Indian child's tribe, the court, in the absence of good cause to the contrary, shall transfer such proceeding to the jurisdiction of the tribe, absent objection by either parent, upon the petition of either parent or the Indian custodian or the Indian child's tribe: *Provided*, that such transfer shall be subject to declination by the tribal court of such tribe."

sound discretion of the trial court. [Citation.] Whether there is a compelling reason not to terminate parental rights has been described as a 'quintessentially discretionary determination.' [Citation.] Nothing in Section 366.24 removes that discretion." (*Ibid.*)

Thus, in the present case, where the Tribe did not even recommend TCA, the court unquestionably had discretion to order a permanent plan other than the Tribe's recommended plan of guardianship. There is no statutory preference for guardianship when recommended by an Indian child's tribe as there is for TCA. The juvenile court had the discretion to order traditional adoption with termination of parental rights as N.S.'s permanent plan absent a compelling reason not to terminate parental rights. (*H.R.*, *supra*, 208 Cal.App.4th at p. 764.)

In *T.S.*, as in the present case, the dependent Indian child's tribe selected guardianship as the child's permanent plan that would meet the tribe's social and cultural standards and protect the child's best interests as an Indian child. (*T.S.*, *supra*, 175 Cal.App.4th at p. 1037.) The child's mother, joined by the appellant father, argued that the tribe's choice was an exception to the statutory preference for adoption. (*Ibid.*) The juvenile court concluded that it had the discretion to find that adoption was in the child's best interests notwithstanding the tribe's preference and terminated parental rights and ordered adoption as the child's permanent plan. (*Id.* at pp. 1037-1038.) On appeal, the father argued that the juvenile court was required to order a permanent plan of guardianship because that was the tribe's recommendation. (*Id.* at pp. 1038, 1039.)

The *T.S.* court disagreed, concluding that, "a juvenile court is not obligated to adopt the permanent plan designated by a child's tribe without conducting an independent assessment of detriment. The exceptions to

31

adoption relating to Indian children, like the other enumerated exceptions to adoption, are contained in section 366.26, subdivision (c)(1)(B), and, therefore, apply only if the described circumstances are present *and* there is a compelling reason for determining that termination of parental rights would be detrimental to the child as a result of such circumstances. . . . Had the Legislature intended to preclude the court from ordering a permanent plan of adoption when a tribe has identified another permanent plan, it could have placed this provision in the next subdivision of section 366.26, subdivision (c)(2), which enumerates circumstances under which the juvenile court 'shall not terminate parental rights,' and includes other provisions involving Indian children . . . . Instead, the provision was added to a subdivision that contains plain, unambiguous language conferring discretion upon the juvenile court to reject the exceptions in the absence of compelling evidence of detriment." (*T.S.*, *supra*, 175 Cal.App.4th at p. 1040, fn. omitted.)

*H.R.* and *T.S.* make it clear that in ordering a permanent plan for an Indian child subject to ICWA, the juvenile court is not restricted to ordering the permanent plan that the child's tribe selects. The permanent plan of adoption ordered in this case may have conflicted with the Tribe's preference and the Tribe's "laws and tenets," but it did not conflict with or frustrate the purpose of ICWA and it was not "preempted" by the Tribe's letter recommending guardianship as N.S.'s permanent plan.

II.

*Mother Has not Established That N.S.'s Counsel Was Prejudicially Ineffective*

Mother contends that N.S.'s counsel[12] breached his duties under section 317 and provided ineffective assistance of counsel by failing to investigate and determine what benefits or membership rights N.S. was entitled to receive from the Tribe before the court terminated parental rights.[13]  Mother specifically faults N.S.'s counsel for not being aware that the Tribe would no longer recognize N.S. as an Indian child if he were adopted with termination of parental rights until counsel cross-examined Goodblanket at the section 366.26 hearing.  Mother argues that N.S. was prejudiced by counsel's lack of knowledge regarding how state adoption would affect N.S.'s potential status as a member of the Tribe because the lack of that information caused the court, in considering whether termination of parental rights would substantially interfere with N.S.'s connection to the Tribal community or his membership rights, to conclude that "his membership rights are not defined."[14]

---

[12]    Two different attorneys from Children's Legal Services appeared on behalf of N.S. in the relevant proceedings, Julia Schooler and Steve Wedel. Wedel appeared at the hearing on Mother's section 388 petition and the section 366.26 hearing.

[13]    The Agency does not challenge Mother's standing to raise this issue.

[14]    After making this statement, the court added, "And no one is indicating that [N.S.] is an enrolled member of the Tribe.  But he does have a connection to the Tribe."  The court presumably was referring to Goodblanket's testimony that N.S. is not an enrolled member of the Tribe and is not eligible for enrollment, and that the Tribe would have to change its rules regarding enrollment in order for N.S. to become eligible in the future.

33

"To succeed on a claim of ineffective assistance of counsel, the appellant must show: (1) counsel's representation fell below an objective standard of reasonableness; and (2) the deficiency resulted in demonstrable prejudice. [Citations.] Unless the record affirmatively establishes counsel had no rational tactical purpose for the challenged act or omission, we must affirm the judgment." (*In re Kristen B.* (2008) 163 Cal.App.4th 1535, 1540-1541.) "A violation of the right to effective counsel is reviewed under the test of harmless error. [Citation.] 'Thus the parent must demonstrate that it is "reasonably probable that a result more favorable to the appealing party would have been reached in the absence of the error" ' [Citation.] It is not necessary to examine whether counsel's performance was deficient before examining the issue of prejudice. [Citation.] A court may reject a claim of ineffective counsel if the party fails to show the result would have been more favorable but for trial counsel's failings." (*In re N.M.* (2008) 161 Cal.App.4th 253, 270.)

Section 317 provides that a primary responsibility of counsel appointed to represent a child is "to advocate for the protection, safety, and physical and emotional well-being of the child . . . ." (§ 317, subd. (c)(2).) Counsel is also required to "investigate the interests of the child beyond the scope of the juvenile proceeding, and report to the court other interests of the child that may need to be protected by the institution of other administrative or judicial proceedings." (§ 317, subd. (e)(3).)

The Agency argues that it is Mother's burden to establish that N.S.'s counsel failed to adequately investigate whether N.S. was eligible for Tribal benefits, and because counsel's confidential attorney work product is not part of the record, under Evidence Code section 664 we must presume that counsel performed all necessary investigation to adequately represent N.S. in the

34

contested section 366.26 hearing, including the facts relevant to whether the Indian child exception to adoption should be applied. We agree with the Agency, but even assuming that N.S.'s counsel did not sufficiently investigate whether termination of parental rights would cause N.S. to lose Tribal benefits, we conclude that Mother has not met her burden of showing that she was prejudiced by counsel's allegedly deficient performance.

Mother cannot show that she was demonstrably prejudiced by N.S.'s counsel's alleged failure to conduct an investigation to determine what Tribal benefits would be available to N.S. if parental rights were not terminated because there is no indication in the record that any such undiscovered benefits were available. The record indicates that the Tribe took little interest in N.S. or this case during the period of Grandmother's guardianship until Grandmother filed her section 388 petition seeking adoption in January 2019.[15] Goodblanket became involved in the case as the Tribe's representative in 2019 and testified at the section 366.26 hearing that N.S. is not eligible for membership in the Tribe and would lose his Indian child status with the Tribe if the court terminated parental rights.[16] However, she did not testify or provide any information to the Agency or Grandmother before the hearing that there were Tribal benefits, other than his Indian child status, that N.S. would lose if the court terminated parental rights and

[15] As noted, the Tribal representative, presumably Goodblanket, told Navarro that the Tribe had "little to no" contact with Grandmother during the period of her guardianship.

[16] Mother's Indian expert Alexander testified that the Tribe recognized descendants of members of the Tribe in ICWA cases and considered them "members under ICWA," but that did not mean that they are eligible to be *enrolled* members of the Tribe.

ordered adoption.  The juvenile court could reasonably infer from the record that there were no such undisclosed benefits and Mother has not shown that there were such benefits.[17]

In asking us to conclude that N.S.'s counsel was prejudicially ineffective for not determining whether such benefits exist and to reverse the order terminating parental rights on that basis, Mother is essentially asking us to conclusively presume that such benefits are available to N.S. and that they are of such magnitude that the court would have found them to be a compelling reason not to terminate parental rights.  However, any potential loss of Tribal benefits to N.S. as a result of adoption is speculative, particularly in light of Goodblanket's testimony that he is not eligible for enrollment in the Tribe.  "We will not reverse . . . on the basis of speculation regarding theoretical possibilities . . . ."  (*People v. Ayala* (2000) 24 Cal.4th 243, 267.)

In sum, Mother has not met her burden of showing that a proper investigation into N.S.'s Tribal benefits would have tipped the scales in favor of guardianship by revealing benefits that the court would have found to constitute a compelling reason to determine that termination of parental rights would be detrimental to N.S.  Mother may be able to make such a showing in a future proceeding, but in this appeal, she has not shown that she was prejudiced by N.S.'s counsel's alleged ineffective assistance—i.e.,

_____

[17]    England testified generally that if a "child is not allowed to be enrolled because they've been adopted, they wouldn't be able to be afforded things we are able to access as Native Americans, very basic things, which is health care, medical care, dental and vision, mental health services."  England's testimony about basic benefits that generally would be available to *enrolled members* of an Indian tribe is not evidence that such benefits were available to N.S., who is not eligible for enrollment in the Tribe.

that but for counsel's deficient investigation into N.S.'s available Tribal benefits, it is reasonably probable that she would have obtained a more favorable result at the section 366.26 hearing.

III.

### *The Court Did Not Err in Finding That the Indian Child Exception to Adoption Does Not Apply*

Mother contends that the court erred in finding that the Indian child exception of section 366.26, subdivision (c)(1)(B)(vi)(I) and (II) did not apply to preclude the termination of parental rights. In addition to renewing her argument that "the statutory exceptions are preempted by the Tribe's decree," she contends that the evidence does not support the juvenile court's conclusion that adoption would not interfere with N.S.'s connection to the Tribe. Additionally, Mother argues that the court should have deferred to the Tribe's selection of guardianship as N.S.'s permanent plan because guardianship served N.S.'s best interests as an Indian child. The essential basis for both arguments is Mother's contention that Grandmother will not make efforts to foster N.S.'s connection to the Tribe if she adopts N.S. and parental rights are terminated, whereas Mother would foster N.S.'s connection with the Tribe if his permanent plan were guardianship.

" ' "At the selection and implementation hearing held pursuant to section 366.26, a juvenile court must make one of four possible alternative permanent plans for a minor child. . . . *The permanent plan preferred by the Legislature is adoption.* [Citation.]" [Citations.] If the court finds the child is adoptable, it *must* terminate parental rights absent circumstances under which it would be detrimental to the child.' " (*T.S.*, *supra*, 175 Cal.App.4th at p. 1038.)

"Before the juvenile court may find an exception to adoption for an otherwise adoptable child, a parent must establish a 'compelling reason for determining that termination would be detrimental to the child' due to one of several specified circumstances.  (§ 366.26, subd. (c)(1)(B).)"  (*T.S.*, *supra*, 175 Cal.App.4th at p. 1038.)  "The parent has the burden of establishing the existence of any circumstance that constitutes an exception to termination of parental rights.  [Citation.]  'Because a section 366.26 hearing occurs only after the court has repeatedly found the parent unable to meet the child's needs, it is only in an extraordinary case that preservation of the parent's rights will prevail over the Legislature's preference for adoptive placement.' "  (*Id.* at p. 1039.)

Section 366.26, subdivision (c)(1)(B)(vi), referred to in case law as the Indian child exception, actually specifies two exceptions to the termination of parental rights that apply to an Indian child as follows:  "The child is an Indian child and there is a compelling reason for determining that termination of parental rights would not be in the best interest of the child, including, but not limited to:  [¶]  (I) Termination of parental rights would substantially interfere with the child's connection to his or her tribal community or the child's tribal membership rights.  [¶]  (II) The child's tribe has identified guardianship, foster care with a fit and willing relative, tribal customary adoption, or another planned permanent living arrangement for the child."  (§ 366.26, subd. (c)(1)(B)(vi).)

"[W]hether a compelling reason exists under the Indian Child Exception is an issue committed to the trial court *as the trier of fact* and its discretion to resolve whether, on any statutory grounds, that termination would be detrimental to an otherwise adoptable child.  (§ 366.26, subd. (c)(1)(B).)"  (*In re A.A.* (2008) 167 Cal.App.4th 1292, 1322 (*A.A.*), italics

38

added.)[18]  Accordingly, we apply the substantial evidence standard of review to the juvenile court's relevant factual findings, and the abuse of discretion standard to the court's determination of whether, based on its factual findings, there was a compelling reason under the Indian child exception to not terminate parental rights.  (See *In re Anthony B.* (2015) 239 Cal.App.4th 389, 395 (*Anthony B.*).)

Under the substantial evidence standard, we do not pass on the credibility of witnesses, attempt to resolve conflicts in the evidence, or reweigh the evidence.  Instead, we draw all reasonable inferences in support of the findings, view the record favorably to the juvenile court's order and affirm the order even if there is other evidence to the contrary.  (*In re Casey D.* (1999) 70 Cal.App.4th 38, 52-53.)  The appellant has the burden of showing that there is no evidence of a sufficiently substantial nature to support the court's finding.  (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 947.)

We conclude that the juvenile court reasonably determined that termination of parental rights would not substantially interfere with N.S.'s connection to the Tribe.  There was no evidence that N.S. actually had any connection to the Tribe at the time of the section 366.26 hearing.  Rather, the evidence showed that Tribe had "little to no" contact with Grandmother during the period of her guardianship, and that in December 2019, N.S. did not know which tribe he was connected to and did not recall having heard the Tribe's name when he was told what it was.

---

18    The Agency correctly notes that the three major published opinions that have addressed the Indian child exception to adoption have reviewed the juvenile court's decision as to whether the exception applies under an abuse of discretion standard.  (*A.A.*, *supra*, 167 Cal.App.4th at pp. 1322-1323; *T.S.*, *supra*, 175 Cal.App.4th at p. 1038; *H.R.*, *supra*, 208 Cal.App.4th at p. 764.)

The juvenile court found that "Grandmother, once she is properly informed, once the expectations are concretely articulated, that she will encourage [N.S.] to learn about his [Native American] heritage. Obviously, the Tribe is a wonderful resource for that if, in fact, there are bridges or common ground that can be established for that." The court also believed that as N.S. grew older, he would become curious about his Native American heritage and would pursue connections with members of the Tribe to learn about it on his own. Thus, the court concluded, "I cannot find there would be a compelling reason [not to order termination of parental rights and adoption as N.S.'s permanent plan] based on a substantial interference with his connection [to the Tribe]."

The court's finding that Grandmother would encourage N.S. to learn about his heritage going forward is supported by substantial evidence. When Goodblanket, at a CFT meeting in April 2019, expressed concern that N.S. was not becoming involved with the Tribe, Grandmother asked about the possibility of receiving a newsletter from the Tribe that would provide information about the Tribe's events. Navarro reported that Grandmother understood the responsibilities of a TCA when Grandmother and the Tribe were both requesting that plan with the Agency's support. When Olimpio asked Grandmother about Goodblanket's concern that the Tribe had "little to no" contact with Grandmother during the period of her guardianship, Grandmother told Olimpio that the Tribe had not reached out to her, and that even when she requested information at a CFT meeting about Tribal activities that N.S. could attend, the Tribe had not responded to her. Olimpio reported that "the Tribe equates this apparent lack of contact with lack of interest, which the grandmother states is not true." Regarding the Tribe's letter requesting guardianship, in which the Tribe expressed concern that

Grandmother would not adhere to the "rights and responsibilities that would be listed in a TCA," Olimpio noted that the Tribe "cite[d] no evidence for their concerns."

Goodblanket testified that she met with Tribe, informed it that Grandmother was willing to engage N.S. in Tribal activities and asked whether there was a mailing list that Grandmother could be on. The Tribe responded that it did not have a mailing list but they gave Goodblanket the address for their website and told her about a Christmas party that Grandmother was invited to attend. Goodblanket testified that the Tribe's not having a mailing list made it "a little bit harder" for the Tribe to facilitate a relationship with Grandmother or to facilitate Grandmother's "ability to know what's going on in the community." Given Grandmother's record of excellent care, the fact that Grandmother had been made aware of the expectation that she would foster a connection between N.S. and the Tribe, and the evidence that she was willing to involve N.S. with the Tribe if she were made aware of relevant Tribal activities, the court could reasonably find that Grandmother would make an effort to foster a connection between N.S. and the Tribe in the future.

The Agency analogizes the Indian child exception to adoption to the sibling relationship exception set forth in section 366.26, subdivision (c)(1)(B)(v), and notes that in *In re D.O.* (2016) 247 Cal.App.4th 166 (*D.O.*), this court concluded that the juvenile court could properly consider a grandmother caregiver's assurances that she would continue to allow visitation between the dependent minor and her half siblings as a factor in determining whether termination of parental rights would substantially interfere with the sibling relationship. (*Id.* at pp. 175-176.) The appellants in *D.O.* (mother and siblings) argued that that " 'no evidence supported the

41

juvenile court's finding that the sibling relationship would remain intact, except for speculation that the caregivers would continue to allow it.' " (*Id.* at p. 176.) The *D.O.* court observed: "This argument ignores that it was *appellants' burden* to establish there would be substantial interference, not the Agency's burden to establish there would not." (*Ibid.*; see *A.A.*, *supra*, 167 Cal.App.4th at p. 1324 [argument that caregivers failed to take steps to promote children's connection to the tribal community overlooked that it was appellants' evidentiary burden to establish termination of parental rights would substantially interfere with the children's connection to the tribe].) The juvenile court in *D.O.* had found that there was no evidence that there would be interference with the sibling relationships, and the *D.O.* court viewed the appellants "assertion on appeal that 'many things can happen over the next 16 years' [as] *speculative.*" (*D.O.*, at p. 176.)

The analogy between assurances of future sibling visitation and assurances of future efforts to foster an Indian child's connection to his or her tribe is valid. Based on the evidence that Grandmother expressed willingness to involve N.S. with the Tribe after she adopted him, the court could reasonably find that termination of parental rights and adoption by Grandmother would not substantially interfere with N.S.'s connection to the Tribe.

In addition to the evidence that Grandmother would make efforts in the future to foster N.S.'s connection with Tribe, the court could also reasonably find that termination of parental rights would not substantially interfere with N.S.'s connection to the Tribe based on evidence that there was very little connection to interfere with. Mother faults Grandmother for not

fostering a connection,[19] but there are two other circumstances that factor into N.S.'s lack of connection with the tribe: the lack of any evidence of a connection between N.S. and his paternal Indian relatives, and the lack of interest in N.S. by the Tribe itself during the period of Grandmother's guardianship.[20] This is not a case where a significant connection to a tribe through the dependent minor's Indian relatives stood to be severed or severely limited through termination of parental rights and adoption by a non-Indian family. The record does not indicate the existence of any connection between N.S. and his paternal relatives or any indication that any paternal relative has ever attempted to connect with him in any way. The record is silent on this point, except for the testimony of Mother's Indian expert Alexandra that, to her knowledge, none of N.S.'s father's family members, who "would be his ancestors that are San Pasqual Indian," had "been involved with N.S. at all[.]" The Indian child exception to adoption concerning interference with the child's connection to his or her tribal community is unlikely to be a compelling reason for determining that termination of parental rights would not be in the best interests of the child

---

[19]  Olimpio asked N.S. about his Tribal heritage in December 2019, after he had been having regular visits with Mother the entire year. As noted, N.S. did not know which tribe he was connected to, and when Olimpio told him the name of the Tribe, he had no memory of having previously heard it. A reasonable inference from this evidence is that neither Grandmother nor Mother at that point had made significant efforts to foster a connection between N.S. and the Tribe.

[20]  As noted, at the section 366.26 hearing the court felt compelled to state that "up until the time the Tribe utilized Ms. Goodblanket to come in and address these issues, the Tribe had its own responsibilities to reach out to [N.S.] and see how he was doing[,]" suggesting that the Tribe had not met those responsibilities.

where, as here, the child has no connection to the tribe through his or her relatives who are members of the tribal community.

It may be that the Tribe's apparent lack of interest in N.S. during the period of Grandmother's guardianship and the lack of any connection between N.S. and his paternal relatives are related—i.e., that the main reason that N.S. had no connection with the Tribe in his early childhood was because none of his Indian relatives were involved in his life. However, regardless of the cause, the reality at the time of the section 366.26 hearing was that any substantial interference with N.S.'s connection to the Tribe for the court to consider would be interference with a potential future connection, because there was no significant past or present connection. As discussed, the juvenile court reasonably found that Grandmother would make efforts to foster a connection in the future. Accordingly, we conclude that the court reasonably found that termination of parental rights would not substantially interfere with N.S.'s connection to the Tribe.

We further conclude that the juvenile court acted well within its discretion in determining that the Tribe's recommendation of guardianship as N.S.'s permanent plan was not a compelling reason to find that termination of parental rights would not be in N.S.'s best interests. As we

discussed *ante*, the juvenile court was not required to order the permanent plan that the Tribe preferred.[21]

The evidence amply supports a finding that termination of parental rights and not applying the Indian child exception would not be detrimental to N.S.  N.S. had spent nearly his entire childhood in Grandmother's care and it was undisputed that she met all of his needs and that he had thrived in her care.  He repeatedly expressed that he wanted Grandmother to adopt him, even though he wanted to continue to have visitation with Mother.  He had been in Grandmother's care under guardianship since he was three years old and, at age eight, he understood the difference between guardianship and adoption.  He recognized that with adoption, he would remain with Grandmother and Mother could not try to regain custody of him, and with guardianship, he would still be with Grandmother but Mother could request that he be returned to her care.  When asked what his future would look like if he could make it any way he wanted, he said he would be adopted and Mother would keep visiting him.  He would like Mother to spend the night at his house but did not want to spend the night at her house.  He expressed his desire to be adopted by Grandmother but to continue to visit Mother to the Agency social workers, his attorney, the Tribal representative, and his psychological evaluator.

---

[21]     Mother acknowledges that under case law, the juvenile court conducts an independent assessment of detriment in determining whether a statutory exception to adoption is a compelling reason not to terminate parental rights. (*T.S.*, *supra*, 175 Cal.App.4th at p. 1040.)  However, she argues that this principle "recognizes the Tribe only as a mere participant rather than a sovereign nation."  Her criticism of case law on this point reflects her position that a tribe's selection of a permanent plan preempts any statutory preference for a different plan and must be followed by the court.  We rejected that position in part I of this opinion.

N.S.'s statements evidence his need and desire for the stability and permanency of adoption. Whether or not N.S. was an Indian child, he " had a fundamental interest in stability and permanency. [Citation.] Adoption gives a child the best chance at a full emotional commitment from a responsible caretaker. [Citation.] Guardianship, while a more stable placement than foster care, is not irrevocable and falls short of the secure and permanent future the Legislature had in mind for a dependent child." (*A.A.*, *supra*, 167 Cal.App.4th at p. 1325; *In re Priscilla D.* (2015) 234 Cal.App.4th 1207, 1215-1216 ["Continuity in a legal guardianship is not equivalent to the security and stability of a permanent caretaker."].) " 'While the ICWA focuses on preserving Indian culture, it does not do so at the expense of a child's right to security and stability.' " (*In re Collin E.* (2018) 25 Cal.App.5th 647, 660, fn. 4.)

The Tribe supported guardianship in large part because it would give Mother a future opportunity to have N.S. returned to her care. The Tribe stated that it would support another section 388 petition by Mother if she had a minimum of six more months of sobriety, and that it was "committed to the reunification of their families, even when that is outside of the legal timeline of the Court." Goodblanket testified that the reason the Tribe wanted to maintain N.S.'s guardianship was to give Mother "an opportunity to potentially become [N.S.'s] full parent again." Thus, in recommending guardianship as N.S.'s permanent plan, the Tribe's focus was on *Mother's* interest and the Tribe's general cultural preference to not terminate parental rights. However, in the words of the *A.A.* court, "although guardianship may have served the Tribe's interests, the court, in assessing [N.S.'s] best interests, was not compelled to agree with the Tribe." (*A.A.*, *supra*, 167 Cal.App.4th at p. 1325.)

The evidence regarding the benefit that N.S. would gain from being adopted by Grandmother versus continuing in his guardianship supports the juvenile court's determination that guardianship was not in N.S.'s best interests and, therefore, the Tribe's identification of guardianship as N.S.'s permanent plan was not a compelling reason to preserve parental rights. The juvenile court did not abuse its discretion in determining that the Indian child exception to adoption did not preclude termination of parental rights based on either substantial interference with N.S.'s connection to the Tribe or the Tribe's identification of guardianship as N.S.'s permanent plan.

IV.

*There is Sufficient Evidence to Support the Court's Finding Beyond a Reasonable Doubt That Continued Custody in Mother's Care Would Be a Substantial Risk to N.S.*

Mother contends that there was insufficient evidence to support the juvenile court's finding beyond a reasonable doubt that continued custody in Mother's care would likely result in serious emotional or physical damage to N.S.

"ICWA protects the interests of Indian children and promotes the stability and security of Indian tribes and families by establishing minimum federal standards in juvenile dependency cases. [Citations.] Those standards require the juvenile court to make certain findings affecting an Indian child before ordering foster care or terminating parental rights. Before the court can terminate parental rights it must make a finding, 'supported by evidence beyond a reasonable doubt, including testimony of qualified expert witnesses, that the continued custody of the child by the parent or Indian custodian is likely to result in serious emotional or physical damage to the child.' (25 U.S.C. § 1912(f); see also § 366.26, subd. (c)(2)(B)(ii).) This finding is commonly referred to as the ICWA detriment finding." (*In re M.B.* (2010) 182

47

Cal.App.4th 1496, 1502 (*M.B.*).) We review the court's ICWA detriment finding for substantial evidence. . . . The appellant has the burden of showing there is no evidence of a sufficiently substantial nature to support the court's finding." (*Id.* at p. 1506.)

We conclude that the juvenile court's ICWA detriment finding is supported by substantial evidence. Although Mother had been doing well in maintaining her sobriety at the time of the section 366.26 hearing, she had a long history of repeatedly attaining sobriety through treatment and then relapsing into substance abuse. According to Grandmother, Mother had been "in and out of different substance abuse programs 15 or more times." The Agency's initial report for the section 366.26 hearing filed in April 2019 noted Mother's chronic substance abuse history dating back to when she was approximately 15 years of age, and her inability to maintain sobriety. After the case was closed in 2014, Mother "would sober up for approximately 6 months and then relapse." The Agency noted that Mother cited the lack of visits with N.S. as a contributing cause of her relapses, but further noted that between 2012 and 2014, Mother had episodes of relapse despite receiving services and even after she reunified with N.S. at one point. The Agency reported that Mother had "been unable to demonstrate substantial progress to address her substance abuse, which does not decrease the protective issue." The Tribe did not support Mother's section 388 petition requesting termination of the guardianship and reunification services to transition N.S. back into her care, stating it "would be supportive of a [section] 388 with a minimum of 6 more months of sobriety." The Tribe believed that it was in N.S.'s best interests to remain in Grandmother's home where he had stability. The court could reasonably view Mother's history of substance abuse as a risk factor in returning N.S. to Mother's custody.

48

ICWA expert England, who had been an Indian expert for over 20 years and had testified in more than 2,000 cases in 22 states, stated in his declaration that, based on the information provided to him, including the Agency's reports, it was his "opinion that a causal relationship exists between the conditions in [Mother's] home and the likelihood that continued custody of [N.S.] by [Mother] or [the father] is likely to result in serious emotional or physical damage to [N.S.]."

It was undisputed that Grandmother took excellent care of N.S., that he thrived in her care, and was happy living with her, as reflected in his statement that "[e]verything here is awesomely best!" As noted, N.S. repeatedly made it clear that he wanted to be adopted by Grandmother and did not want to live with Mother, although he wanted to continue to visit her.

In finding beyond a reasonable doubt that custody with Mother would likely to result in serious emotional or physical damage to N.S., the court noted England's opinion to that effect and focused on the fact that N.S.'s primary attachment was to Grandmother and that his clear preference was to remain in her care. The court stated that the "emotional difficulty" N.S. would experience if he were returned to Mother's care "would stem primarily from the fact that his entire world and environment would be disrupted. And this is a young man who has relied very heavily on his environment. So I do believe, by evidence beyond a reasonable doubt, that there would be emotional damage to him with respect to continued custody [by Mother]."[22] The court added that "[N.S.] enjoys being with his mother. He knows his mother is his mother. But he also knows that someone else occupies an even

---

[22] The court clarified that it was referring to physical custody rather than legal custody.

more hallowed position in his life, and that is his Grandmother. His Grandmother's been there through thick and thin. When he's had a cold, she has assisted him. When he's had a headache, she's been there to alleviate the pain. When he's had the flu, she's put that cold compress on his forehead and had him bend over the commode. [¶] Those types of activities, that type of experience, really does forge the attachment and bond he has with his grandmother. There is no similar forging of an attachment or bond with the mother because of the practical aspects of being out of his mother's care for two-thirds of his life."

The evidence overwhelmingly supports the court's view that N.S.'s primary attachment is to his Grandmother and that his "entire world" would be disrupted if he were removed from her care against his express and repeated wishes. Accordingly, the court reasonably found beyond a reasonable doubt that returning N.S. to Mother's custody would likely result in serious emotional damage to N.S.

## V.

### *The Court Did Not Err in Finding That the Beneficial Parent-Child Relationship Exception to Adoption Does Not Apply*

Mother contends that the juvenile court erred in finding that the beneficial parent-child relationship exception of section 366.26, subdivision (c)(1)(B)(i) does not apply to preclude termination of parental rights. We disagree.

At a permanency hearing, under section 366.26, subdivision (b), the court must select the dependent child's permanent plan from a number of statutory alternatives, including adoption, TCA, guardianship and long-term foster care. " 'If the dependent child is adoptable, there is a strong preference for adoption over the alternative permanency plans.' [Citation.] 'Once the

50

court determines the child is likely to be adopted, the burden shifts to the parent to show [a compelling reason to determine] that termination of parental rights would be detrimental to the child under one of the exceptions listed in section 366.26, subdivision (c)(1). [Citations.] Section 366.26, subdivision (c)(1)(B)(i), provides an exception to termination of parental rights when "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." ' " (*In re G.B.* (2014) 227 Cal.App.4th 1147, 1165 (*G.B.*).)

This court has interpreted "the 'benefit from continuing the [parent[-]child] relationship' exception to mean the relationship promotes the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents. In other words, the court balances the strength and quality of the natural parent[-]child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).)

"A parent asserting the parental benefit exception has the burden of establishing that exception by a preponderance of the evidence. [Citation.] It is not enough to show that the parent and child have a friendly and loving relationship. [Citation.] ' "Interaction between [a] natural parent and child will always confer some incidental benefit to the child . . . ." ' [Citation.] For the exception to apply, 'a *parental* relationship is necessary[.]' [Citation.] ' "While friendships are important, a child needs at least one parent. Where a biological parent . . . is incapable of functioning in that role,

51

the child should be given every opportunity to bond with an individual who will assume the role of a parent." ' " (*In re J.C.* (2014) 226 Cal.App.4th 503, 529 (*J.C.*).)

"We apply the substantial evidence standard of review to the factual issue of the existence of a beneficial parental relationship, and the abuse of discretion standard to the determination of whether there is a compelling reason for finding that termination would be detrimental to the child." (*Anthony B., supra,* 239 Cal.App.4th at p. 395.)

Regarding the existence of a parental relationship, substantial evidence supported the juvenile court's determination that although N.S. enjoyed his visitation with Mother and wanted it to continue, the relationship between Mother and N.S. was not a parent-child relationship; N.S.'s parental bond was with Grandmother. In the Agency's initial report for the section 366.26 hearing, Navarro noted that although Mother had been consistent and loving in her visitation with N.S., "due to the fact that [N.S.] has only resided with his mother for approximately 20 months of his seven years of life, their relationship can be described as a loving and friendly relationship. Furthermore, [N.S.] shows no signs of grief when separating from the mother at the end of each visit. Moreover, [N.S.] has expressed his needs to multiple professional identities that increasing visitation is not something he desires or appears to need. [N.S.] has also voiced not wanting to keep the scheduled two phone calls a week and requested to decrease it to one. Additionally, when [N.S.] was asked about his mother's involvement and attendance to his [extracurricular] activities, Noah specified he did not want his mother present as he does not want anything to change." Navarro reported that N.S. had a great love for Grandmother and that he had "developed a parental

relationship and bond with [Grandmother] as he had lived with her for the majority of his life."

Although N.S. increasingly enjoyed visitation with Mother and progressed to wanting to have overnight visits with her, he never wavered in his wish to be adopted by Grandmother. Thus, at the section 366.26 hearing, the juvenile court reasonably found that N.S.'s primary attachment was with Grandmother and that his clear preference was to remain in her care. The court observed that "[N.S.'s] established connection to his grandmother, who he regards as a mother figure, is the most powerful and persuasive aspect of this case."

Even assuming that there is sufficient evidence to support a finding of a beneficial parent-child relationship between Mother and N.S., we conclude that Mother has not met her burden of showing that the juvenile court abused its discretion in determining that termination of parental rights would not be detrimental to N.S. Although the court recognized at the section 366.26 hearing that N.S. enjoyed being with Mother, and that both Mother and N.S. described their visits, in the court's words, "as appropriate and enjoyable[ and] loving," the court found that "the benefits that the mother confers upon [N.S. are] greatly outweighed by his need for stability in placement, which can only be achieved by adoptive placement." Noting N.S.'s stability and developmental progress in Grandmother's care and reiterating that the stability of N.S.'s placement with Grandmother outweighed the benefits that he received from his contact with Mother, the court concluded that "it would not be in [N.S.]'s best interests to promote or facilitate a mother-child relationship." In connection with its ICWA detriment finding, the court acknowledged that it was important for N.S. to have a connection with Mother. The court added, "But that does not mean that the connection,

if it is disrupted . . . would be so detrimental to him[] that termination of parental rights should not occur."

The evidence discussed *ante* that supports the juvenile court's rejection of the Indian child exception to adoption and the court's finding beyond a reasonable doubt that custody with Mother would likely result in serious emotional or physical damage to N.S. also supports the court's determination that terminating parental rights would not be detrimental to N.S. under the beneficial parent-child relationship exception to adoption.  In particular, the evidence that N.S. is happy and thriving in Grandmother's care and that he has consistently and unequivocally expressed the desire to be adopted by Grandmother sufficiently supports the court's determination that terminating parental rights would not cause N.S. to be greatly harmed.

Accordingly, we conclude that the court did not abuse its discretion in determining that there is no compelling reason to find that termination of parental rights would be detrimental to N.S.  Substantial evidence in the record supports the court's finding that, notwithstanding the positive aspects of the relationship between Mother and N.S., the benefit that N.S. would gain from adoption by Grandmother outweighs any detriment to him that would result from termination of parental rights.  Mother has not met her burden of showing that the juvenile court erred in finding that the beneficial parent-child relationship exception of section 366.26, subdivision (c)(1)(B)(i) did not apply to preclude termination of her parental rights.

## DISPOSITION

The order terminating parental rights and selecting adoption as N.S.'s permanent plan is affirmed.

AARON, J.

WE CONCUR:

BENKE, Acting P. J.

HUFFMAN, J.

Filed 10/9/20

CERTIFIED FOR PUBLICATION

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA

| | |
|---|---|
| In re N.S., a Person Coming Under the Juvenile Court Law. | |
| | D077177 |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, | |
| Plaintiff and Respondent, | (Super. Ct. No. NJ14703) |
| v. | ORDER CERTIFYING OPINION FOR PUBLICATION |
| C.V., | |
| Defendant and Appellant. | |

THE COURT:

The opinion in this case filed on September 17, 2020, was not certified for publication. It appearing the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c), the request pursuant to rule 8.1120(a) for publication is GRANTED.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to Be Published in the Official Reports" appearing on page one of said opinion be deleted and the opinion herein be published in the Official Reports.

BENKE, Acting P. J.

Copies to: All parties